15-3549

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

❖

JULIE CHARBONNEAU,

*Plaintiff-Appellant,*

—v.—

CHARTIS PROPERTY CASUALTY CO,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**BRIEF FOR PLAINTIFF-APPELLANT
AND JOINT APPENDIX
VOLUME I OF IV
(Pages A1 to A55)**

FINLEY T. HARCKHAM, ESQ.
DARIN J. MCMULLEN, ESQ.
NICHOLAS R. MAXWELL, ESQ.
ANDERSON KILL P.C.
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
(267) 216-2700

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF SUBJECT MATTER AND APPELLATE
    JURISDICTION ............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

STATEMENT OF THE CASE...................................................................2

I.    STATEMENT OF UNDISPUTED RELEVANT FACTS. ............................2

    A.    The Lease Option Agreement. ............................................3

    B.    The Chartis Policy and the Other Insurance Policies Sold
        by Chartis to Charbonneau and Topolinski............................5

    C.    The Fire. .................................................................6

    D.    Chartis Begins Secretly Negotiating with C&C to
        Resolve the Homeowners Claim with Batoff Alone, and
        Batoff Attempts to Void Charbonneau's Option under the
        LOA.......................................................................9

    E.    Chartis Learns about Charbonneau's Exercise of the
        Option During Its Undisclosed Settlement Negotiations
        with Batoff...............................................................11

    F.    Chartis Refuses to Settle without a Complete Release
        Against Future Claims by Charbonneau and Waives the
        Policy's Proof of Loss Requirement. ..................................13

    G.    The Chartis-Batoff Settlement Is Signed, and Chartis
        Wires Batoff $18.5 Million Three Days Later. ....................15

    H.    Two Months After the Chartis-Batoff Settlement, Batoff
        Uses Chartis's Subrogation Rights to File a RICO
        Lawsuit Against Charbonneau and Topolinski, and the
        Parties Eventually Settle both Prior Suits by Batoff. ...........18

i

# TABLE OF CONTENTS
## (continued)

Page

II.    PROCEDURAL HISTORY. ........................................................................19

SUMMARY OF THE ARGUMENT ...................................................................20

ARGUMENT 1:  THE DISTRICT COURT INCORRECTLY
        GRANTED SUMMARY JUDGMENT ON
        CHARBONNEAU'S BREACH OF CONTRACT AND BAD
        FAITH CLAIMS. ..........................................................................26

STANDARD OF REVIEW ...................................................................................26

APPLICABLE LEGAL STANDARDS .................................................................26

I.    IN PARAGRAPH 17, RECEIPT OF AN "ASSIGNMENT" ON
        CLOSING UNAMBIGUOUSLY REFERS TO A
        DOCUMENT MEMORIALIZING THE PRIOR TRANSFER
        OF SUBSTANTIVE RIGHTS TO CHARBONNEAU. ...............................28

II.    IF CHARBONNEAU'S INTERPRETATION IS NOT THE
        ONLY REASONABLE ONE, "ASSIGNMENT" IS
        PATENTLY AMBIGUOUS. ........................................................................32

III.    AT THE VERY LEAST, EXTRINSIC EVIDENCE
        DEMONSTRATES A LATENT AMBIGUITY...........................................33

        A.    Paragraph 17 Was Intended to Facilitate Charbonneau's
                Receipt of Insurance Proceeds. ..........................................................34

        B.    Chartis Has Offered No Competing Extrinsic Evidence. ...................35

# TABLE OF CONTENTS
### (continued)

**Page**

IV.    THE DISTRICT COURT MADE MULTIPLE REVERSIBLE
       ERRORS....................................................................................................36

V.     IF THIS COURT REVERSES THE BREACH OF
       CONTRACT RULING, IT SHOULD ALSO REVERSE THE
       STATUTORY BAD FAITH RULING. .........................................................37

ARGUMENT 2:  THE DISTRICT COURT INCORRECTLY
       ENTERED JUDGMENT FOR CHARTIS ON
       CHARBONNEAU'S TORTIOUS INTERFERENCE WITH
       CONTRACT CAUSE OF ACTION. ............................................................38

STANDARD OF REVIEW ...................................................................................38

I.     PLAINTIFF MET ALL ELEMENTS OF TORTIOUS
       INTERFERENCE WITH CONTRACT, BUT THE DISTRICT
       COURT APPLIED THE INCORRECT LEGAL
       STANDARDS. ...........................................................................................39

       A.    The Lease Option Agreement Was a Contractual
             Relationship between Charbonneau and Batoff...................................41

       B.    The District Court Applied the Incorrect Intent Standard;
             Under the Correct Standard, Chartis Knew Batoff's
             Breach Was "Substantially Certain to Result" from
             Chartis's Conduct. .................................................................................41

             1.    A Defendant May "Induce" a Breach of
                   Contract by Knowing the Breach Is
                   "Substantially Certain to Result" from the
                   Defendant's Acts. .........................................................................41

             2.    Whether Batoff Wanted to Breach the LOA
                   Does Not Alter the Fact that Chartis Was
                   "Substantially Certain" He Would Do So. ....................47

             3.    Based on the District Court's Erroneous
                   Legal Standards, the District Court's Factual

iii

# TABLE OF CONTENTS
## (continued)

**Page**

Findings on Intent Must Be Disregarded or
Reviewed Under a *De Novo* Standard of
Review. ........................................................................50

C.  Assuming Actual Breach Is a Requirement for Tortious
Interference, Batoff Did Breach the LOA. ..........................................51

D.  The District Court's Legal Errors Regarding "Intent"
Invalidate Its Factual Findings on Absence of Privilege. ...................54

E.  If Charbonneau Can Show the Other Elements of
Tortious Interference, that Will Automatically Show that
Chartis Caused Her Damages.................................................................56

II.  EVEN ASSUMING THE DISTRICT COURT APPLIED THE
CORRECT LEGAL STANDARDS, ITS FINDINGS OF FACT
ARE CLEARLY ERRONEOUS AND SHOULD BE
REVERSED..................................................................................................56

A.  Chartis Wanted Batoff to Breach the LOA, Because
Chartis Knew the Breach Could Save Chartis Millions in
GRC Coverage that It Otherwise Owed to Charbonneau. .................56

B.  Chartis Repeatedly Acknowledged Charbonneau Had an
Interest in the Chartis Policy But Then Settled without
Informing Her, Violating "the Rules of the Game." ..........................59

1.  Chartis Knew There Were Competing
Claims to Its Policy Proceeds and Should
Have Instituted an Interpleader Action............................60

2.  The Pennsylvania Unfair Insurance Practices
Act (UIPA) Did Not Require Chartis to
Secretly Settle with Batoff...............................................62

# TABLE OF CONTENTS
## (continued)

**Page**

CONCLUSION ................................................................................64

CERTIFICATE OF BAR MEMBERSHIP .......................................................65

CERTIFICATE OF COMPLIANCE ................................................................66

VIRUS CERTIFICATION & IDENTICAL COMPLIANCE OF
      BRIEF ...............................................................................67

CERTIFICATE OF SERVICE ................................................................68

nydocs1-1061264.6

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adler, Barish, Daniels, Levin & Creskoff v. Epstein,
    393 A.2d 1175 (Pa. 1978)............................................................................39, 41

Advent Sys. v. Unisys Corp.,
    925 F.2d 670 (3d Cir. 1991) .................................................................................55

Allegheny Int'l v. Allegheny Ludlum Steel Corp.,
    40 F.3d 1416 (3d Cir. 1994) .................................................................................26

Am. Cyanamid Co. v. Fermenta Animal Health Co.,
    54 F.3d 177 (3d Cir. 1995) ...................................................................................28

Avins v. White,
    627 F.2d 637 (3d Cir. 1980) .................................................................................46

Bohler-Uddeholm Am. Inc. v. Ellwood Group, Inc.,
    247 F.3d 79 (3d Cir. 2001) ...........................................................................passim

Bose Corp. v. Consumers Union,
    466 U.S. 485 (1984)......................................................................................39, 51

Commonwealth v. UPMC,
    2015 Pa. LEXIS 2722 (Pa. Nov. 30, 2015) .........................................................29

Coolspring Stone Supply v. Am. States Life Ins. Co.,
    10 F.3d 144 (3d Cir. 1993) ...................................................................................26

Eagle v. Morgan,
    No. 11-cv-4303, 2011 U.S. Dist. LEXIS 147247 (E.D. Pa. Dec. 22, 2011) ......45

Empire Trucking Co. v. Reading Anthracite Coal Co.,
    71 A.3d 923 (Pa. Super. Ct. 2013).......................................................................59

Gibson v. Mayor & Council of Wilmington,
    355 F.3d 215 (3d Cir. 2004) .................................................................................32

Glenn v. Point Park College,
    272 A.2d 895 (Pa. 1971).........................................................................39, 54, 59

i

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Hauger v. John Hancock Life Ins. Co. (U.S.A.),
 No. 07-cv-1711, 2008 U.S. Dist. LEXIS 8413 (M.D. Fla. Feb. 5, 2008) ..........61

In re Dow Corning Corp.,
 198 B.R. 214 (Bankr. E.D. Mich. 1996)...........................................................61

John F. Harkins Co. v. Waldinger Corp.,
 796 F.2d 657 (3d Cir. 1986) ...............................................................................35

Kosiba v. Merck & Co.,
 384 F.3d 58 (3d Cir. 2004) .................................................................................51

Krizovensky v. Krizovensky,
 624 A.2d 638 (Pa. Super. Ct. 1993).....................................................................27

Lewandowski v. Life Ins. Co.,
 608 A.2d 1087 (Pa. Super. Ct. 1992)..............................................................60, 61

Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,
 619 F.2d 1001 (3d Cir. 1980) ...............................................................28, 32, 33

Post v. St. Paul Travelers Ins. Co.,
 691 F.3d 500 (3d Cir. 2012) ...........................................................................38, 39

Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc.,
 No. 00-cv-3683, 2001 U.S. Dist. LEXIS 10709 (E.D. Pa. July 26, 2001)...54, 55

Schulman v. J.P. Morgan Inv. Mgmt.,
 35 F.3d 799 (3d Cir. 1994) ...........................................................................54, 59

Shaffer v. Flick,
 520 A.2d 50 (Pa. Super. 1993) .......................................................21, 30, 31, 35

Steuart v. McChesney,
 444 A.2d 659 (Pa. 1982)......................................................................................27

Suders v. Easton,
 325 F.3d 432 (3d Cir. 2003) ...............................................................................26

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Sumitomo Mach. Corp. of Am. v. AlliedSignal,
    81 F.3d 328 (3d Cir. 1996) ...................................................................35

Synthes, Inc. v. Emerge Med., Inc.,
    25 F. Supp. 3d 617, 729 (E.D. Pa. 2014)............................................45

Tomalewski v. State Farm Life Ins. Co.,
    494 F.2d 882 (3d Cir. 1974) ...............................................................26

Total Care Sys. v. Coons,
    860 F. Supp. 236 (E.D. Pa. 1994)..........................................45, 51, 52

Triffin v. Janssen,
    626 A.2d 571 (Pa. Super. Ct. 1993).....................................................39

Velocity Int'l, Inc. v. Celerity Healthcare Sols., Inc.,
    846 F. Supp. 2d 332 (W.D. Pa. 2011)..................................................54

Windsor Secur., Inc. v. Hartford Life Ins. Co.,
    986 F.2d 655 (3d Cir. 1993) ...............................................................45

Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div.,
    422 A.2d 611 (Pa. Super. 1980) ...................................................44, 58

**STATUTES**

42 Pa.C.S. § 8371.................................................................................37

40 Pa. Stat. 1171.5 ...............................................................................62

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1332....................................................................................1

28 U.S.C. § 1335(a)(1)....................................................................60, 62

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014) .....................................28, 33, 42

iii

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**Page(s)**

Oxford English Dictionary, http://www.oed.com....................................................29

Pa. R.C.P. No. 2303 ..................................................................................................60

Restatement (Second) of Torts.........................................................................passim

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The United States District Court for the Eastern District of Pennsylvania (the "District Court") has jurisdiction pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between Plaintiff-Appellant Julie Charbonneau ("Charbonneau") and Defendant-Appellee Chartis Property Casualty Co. ("Chartis"), and the amount in dispute exceeds $75,000 exclusive of interest and costs.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered judgment on June 30, 2015 granting in part Chartis's motion for summary judgment, A3,[1] and the District Court entered judgment in Chartis's favor on September 21, 2015, after trial of Charbonneau's cause of action surviving Chartis's motion for summary judgment.  A34.

Charbonneau timely filed her notice of appeal on October 20, 2015. A1.  This appeal is from two final orders that together dispose of all of Charbonneau's claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether the District Court erred in granting summary judgment dismissing Charbonneau's breach of contract and statutory bad faith claims?

---

[1] The "A" designation refers to the parties' Joint Appendix.  Where helpful for context, Charbonneau also includes descriptive parentheticals or references to the specific testimony contained on the referenced page of the Joint Appendix.

Standard of review:  *de novo*.

2. Whether at trial the District Court applied the wrong legal standard for tortious interference with contractual relations?

Standard of review:  *de novo*.

3. Whether the District Court erred in holding that Chartis did not tortiously interfere with Charbonneau's contractual relations with a third party?

Standard of review: clear error.

## <u>STATEMENT OF RELATED CASES AND PROCEEDINGS</u>

This case has not been before this Court previously and there are no related cases pending before this Court or any other court or agency.

## <u>STATEMENT OF THE CASE</u>

## I. STATEMENT OF UNDISPUTED RELEVANT FACTS.

In 2010, Charbonneau, an award-winning Montreal-based interior designer, was planning to relocate to Philadelphia to be near her domestic partner, Dean Topolinski ("Topolinski").  While scanning real estate websites, she found an extraordinary home located at 200 South Ithan Avenue, Villanova, Pennsylvania. A585 (34:24-35:8).  The French chateau-style mansion was known as Bloomfield. <u>Id</u>.  Bloomfield was built in the early 20th century by Philadelphia-based architect Horace Trumbauer, also known for landmarks such as the Philadelphia Museum of Art, with grounds designed by the famed Olmstead Brothers.  A586 (38:18-39:22).

**A.    The Lease Option Agreement.**

Charbonneau and Topolinski contacted Jerald Batoff ("Batoff"), the co-owner of Bloomfield.  Batoff, Charbonneau and Topolinski agreed on a purchase price of $5.2 million and entered into a series of real estate agreements to facilitate the sale.  A586 (39:23-40:6); A589 (52:8-15).  During the course of the first two agreements, Charbonneau, or companies acting on her behalf, paid Batoff approximately $2.2 million in non-refundable deposits, more than forty percent of the entire purchase price.  A590 (55:25-57:5); A1517 (email listing deposits).  Effective November 3, 2011, Charbonneau and Batoff signed a final agreement, which was structured as a five year lease with option to purchase, under which Charbonneau could exercise her option to complete the purchase at any time (the "LOA").  A182-202.

In addition to the basic option provision, the LOA includes a separate term concerning Charbonneau's rights in the event Bloomfield suffered a casualty such as a fire ("Paragraph 17").  Paragraph 17 reads in pertinent part as follows:

> In the event [of] any casualty to the Property, [Charbonneau] will give immediate notice thereof to [Batoff]. …  If the cost to repair any damage is more than $1,000,000 [Charbonneau] may elect to exercise [her] Option, *and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to [Batoff], and an assignment [of] all of [Batoff's] rights to receive any unpaid proceeds.  [Batoff] may make proof of loss; provided, however, that any adjustment of a proof of loss*

3

> *shall require the prior written consent of [Charbonneau]*,
> which shall not be unreasonably withheld or delayed.

A188 (emphasis added).  The LOA also required Charbonneau to pay the

premiums for Batoff's homeowners insurance.  A185 (¶ 9).

Paragraph 17 was drafted by Russell Whitman, Esq. ("Whitman"), the

real estate lawyer Charbonneau retained to negotiate the LOA.  A450-452

(Affidavit of Russell Whitman, Esq. ("Whitman Aff.")).  At the time he drafted

Paragraph 17, Whitman understood that if Charbonneau exercised her option,

equitable ownership of Bloomfield—including any insurance proceeds available to

rebuild it—would transfer to her automatically by operation of Pennsylvania law.

A451 (¶ 4).

Accordingly, Whitman drafted Paragraph 17 to ensure there would be

no hiccups in the rebuilding process, especially Charbonneau's receipt of the

insurance proceeds assigned to her upon exercise of her option.  Batoff would be

required to give Charbonneau a writing memorializing the assignment of policy

proceeds when the parties to the LOA closed on Bloomfield.  A451-452 (¶ 5).

Charbonneau could then present this written instrument to Chartis to simplify

Chartis's investigation, adjustment and payment of the claim, in order to facilitate

the actual rebuilding of the home.  To give Charbonneau as much control over

insurance claims as possible, since Batoff would be the insured party prior to

Charbonneau exercising the purchase option, Whitman included in Paragraph 17

4

that Batoff could submit an insurance claim by proof of loss, but only with

Charbonneau's written consent (the "Right to Consent").  A188.

>   **B.   The Chartis Policy and the Other Insurance Policies Sold by Chartis to Charbonneau and Topolinski.**

Prior to Charbonneau executing the LOA, Chartis sold Batoff

Homeowners Policy No. PCG 0000183269, for the policy period September 9,

2011 through September 9, 2012 (the "Chartis Policy").  A133-166.  The Chartis

Policy included two separate coverages with separate limits of liability.  The

policy's replacement cost coverage was $22,372,762.  A133.  In the event the

home was rebuilt at the same physical location, the policy included additional

unlimited "Guaranteed Rebuilding Cost" coverage (the "GRC Coverage"):

> Guaranteed Rebuilding Cost coverage means that for a covered loss we will pay the reconstruction cost of your house or other permanent structure, for each occurrence, *even if this amount is greater than the amount of coverage shown on the Declarations Page*.

A162 (emphasis added).

The Chartis Policy required that in the event of a loss, the

policyholder:

> 7.  Send to [Chartis] within sixty (60) days of [Chartis's] request, your signed sworn proof of loss which sets forth, to the best of your knowledge:
>
> > a. The time and cause of loss;
> >
> > b. *The interest of all others in the property;*

> c. Other insurance which may cover the loss; and
>
> d. The dollar amount being claimed as your loss.

A149 (emphasis added).  The Chartis Policy did not reference any other type of claim resolution mechanism, and in fact resolving claims any other way than with proof of loss is exceedingly rare—Chartis Senior Vice President Peter Piotrowski, who manages 123 Chartis claims handlers, testified that he sees only 4-5 such claims *per year*.  A843 (203:1-2); A845 (213:14-17).

Chartis also sold personal property insurance policies to Charbonneau and Topolinski.  A593 (67:16-68:7); A635 (235:15-23).

## C.    The Fire.

On the afternoon of April 4, 2012, while Charbonneau, Topolinski and their housekeeper were inside, a fire started in the basement of Bloomfield. A591-592 (60:8-63:1).  The fire grew and by the time it was put out significant parts of the home were completely destroyed, along with millions of dollars of furnishings and other contents, rendering the entire home uninhabitable.  A592 (63:11-23).

Chartis was immediately notified of the fire, and shortly thereafter Batoff, Charbonneau and Topolinski retained the public adjusting firm Clarke & Cohen ("C&C") to facilitate their various insurance claims.  A1431, A1801.  Two C&C adjusters, Richard Cohen ("Cohen") and Damon Faunce ("Faunce"), would

6

assist Batoff, Charbonneau and Topolinski.  Batoff and Cohen had been friends for over 25 years.  A1166.

Charbonneau believed that C&C were representing her not just with respect to her contents claims, but also with respect to her interest in the homeowners claim under the Chartis Policy.  A594 (71:21-72:14).  Recognizing Charbonneau's general Right to Consent under the LOA, Batoff sought and received Charbonneau's consent to the terms of his retention of C&C before finalizing it.  A1434.  Charbonneau was led to believe that since Batoff knew she wished to own and rebuild Bloomfield, and since she had already paid over $2.2 million for the opportunity to do so, C&C and Chartis would recognize her interests and handle the insurance claims accordingly.  A598 (86:9-87:14).

Shortly after the fire, Chartis assigned claims handler James O'Keefe ("O'Keefe") to handle the claim under the Chartis Policy as well as Charbonneau's and Topolinski's contents claims.  A793-794 (5:21-6:3).  O'Keefe learned about the ownership of the home and the financial relationship between Batoff and Charbonneau.  A1519.  He requested and received various documents, including the LOA and a log of the deposit payments previously made by Charbonneau or on her behalf.  A1486-1517.

At least initially, O'Keefe kept detailed notes regarding Bloomfield.

O'Keefe reviewed the LOA closely and, in a claims note a few weeks after the fire,

made the following statements:

- Charbonneau had the right to exercise her option after a qualifying casualty, at which point Batoff "would be required to tender any proceeds from our claim to [Plaintiff]."

- Charbonneau had made non-refundable deposits of at least $2,159,970 toward the purchase of Bloomfield.

- Paragraph 17 "required [Batoff] to assign any property insurance proceeds (such as our policy) to the tenant in the event of a casualty/loss (such as this claim)."

- Paragraph 17 had been inserted into the LOA "due to the extent of the deposit [Charbonneau] had already made toward the purchase of the home."

- Charbonneau was paying the Chartis Policy premiums pursuant to the terms of the LOA.

- Charbonneau had the "sole right" to exercise her option at any time, after which point Batoff would be required to close within 45 days.

A1520.

O'Keefe also learned that despite the extensive damage to Bloomfield,

Charbonneau still planned to own and rebuild it, or, in O'Keefe's words,

Charbonneau "wanted to bring it back to its historical grandeur." A838-839

(185:14-186:1). Accordingly, he knew that Charbonneau would invoke the Chartis

Policy's GRC Coverage.

In a subsequent claims note, O'Keefe noted that Charbonneau "does

have an insurable interest in at least a portion of the insurance proceeds (up to the

8

amount of their deposits) as things now stand." A2163. O'Keefe then noted that the cost of repairing/rebuilding Bloomfield could be as high as $30 million, though he also suggested the cost could be lower. Id. C&C had procured a report putting the cost as high as $48 million, though C&C apparently stated that $35 million was a more reasonable figure. Id. Even if the cost was only $30 million, the upper range of O'Keefe's opinion at that time, it would exceed the $22.3 million replacement cost limit of the Chartis Policy by nearly $8 million.

### D. Chartis Begins Secretly Negotiating with C&C to Resolve the Homeowners Claim with Batoff Alone, and Batoff Attempts to Void Charbonneau's Option under the LOA.

In the weeks following the fire, Charbonneau was led to believe that C&C was working with Chartis on the homeowners claim with her best interests in mind. A594 (71:21-72:14). In the summer of 2012, however, Chartis began discussing a resolution of that claim that would cut Charbonneau out completely. On July 6, 2012, O'Keefe traveled to Philadelphia from his home in Connecticut for a face-to-face meeting with Cohen and Faunce. A2162-2164. There, the three men discussed resolving the claim for a one-time cash payment to Batoff, rather than by funding Charbonneau's rebuild of Bloomfield under the unlimited GRC Coverage. Id. Chartis eventually did settle with Batoff for a one-time cash payment. Infra pp. 15-17. Charbonneau was never informed of the July 6, 2012 meeting, even though she had retained C&C to represent her interests in

9

Bloomfield.  A594 (71:21-72:14).  O'Keefe never asked C&C whether they had

informed her of it or other negotiations between Chartis and C&C, even though it

was abundantly clear that C&C was no longer representing her interests.  A1232

(325:9-18).

A couple weeks later, on July 25, 2012, Charbonneau received a letter

from Batoff with a laundry list of alleged defaults by Charbonneau under the LOA

and an assertion that Charbonneau's purchase option was void.  A1532-1534.

Charbonneau was stunned by Batoff's July 25, 2012 letter.  A596 (80:24-81:3).

She quickly realized that she had for months wrongly assumed that C&C and

Batoff were working with her interests as optionee and partial owner of Bloomfield

in mind.  A598 (86:9-87:14).

Charbonneau retained counsel, Dechert LLP, and on August 7, 2012

sent a response to Batoff addressing the alleged defaults, formally exercising her

option to purchase Bloomfield, and demanding a closing on September 7, 2012.

A1783-1787.  On August 15, 2012, Batoff responded to Charbonneau's August 7,

2012 letter by explicitly rejecting her exercise of the option—thereby refusing to

close on Bloomfield—and enclosing the Complaint in the action captioned *Batoff

v. Charbonneau and Topolinski*, which Charbonneau and Topolinski subsequently

removed to federal court (the "First Federal Action").  A1543-1544 (letter);

A1727-1792 (complaint).

**E.    Chartis Learns about Charbonneau's Exercise of the Option During Its Undisclosed Settlement Negotiations with Batoff.**

The First Federal Action Complaint included extensive allegations regarding the invalidity of the purchase option based on Charbonneau's alleged defaults under the LOA.  A1742-1746.  Importantly, the Complaint attached as an exhibit the August 7, 2012 letter in which Charbonneau exercised her option.  A1783-1787.  During this litigation, Chartis repeatedly acknowledged that it learned about the First Federal Action before secretly settling with Batoff.

- In its Seventeenth Affirmative Defense to Charbonneau's Amended Complaint, Chartis stated as follows:  "*Although Chartis knew of the litigation in the Federal Actions*, Batoff, the sole insured under the Homeowner's Policy, pursued and insisted on payment under his Homeowner's Policy claim through his representative, Clarke & Cohen." A1657 (emphasis added).

- At deposition, O'Keefe testified as follows:

  Q: [D]oes [the First Federal Action Complaint] refresh your recollection about hearing about litigation between [Charbonneau and Batoff] at that time …?

  A: I -- I did hear about -- that that they were going to have litigation or actually -- but I think it was all kind of after we were done that I heard there was a lawsuit between the parties.

  Q: You think so?

  A: I don't remember the exact timing of when I found out about that.

> Q: Is it possible that it was before your settlement was done?
>
> A: No.  I don't know -- I don't really recall that I -- I was told one was suing the other.  I may have been, but I can't specifically recall.  I do know that I learned there was a lawsuit and that they subsequently resolved it.

A838 (184:2-14, deposition testimony read at trial).

At trial, O'Keefe tried to walk back his and Chartis's earlier admissions:

> Q: You were not aware [of the First Federal Action prior to settling with Batoff]?
>
> A: No.
>
> Q: Who at Chartis was aware of that?
>
> A: I do not know.
>
> Q: Isn't that an important fact that should've been in the claim file?
>
> A: If someone knew, yes.
>
> Q: But it wasn't, was it?
>
> A: No.

A803 (45:3-11).

> Q: And [your] testimony today was that you did not know about [Charbonneau's] August 7, 2012 exercise of the option at any time?
>
> A: Absolutely, I did not know.

12

A837 (179:16-18). Even if O'Keefe was telling the truth at trial, which

Charbonneau disputes, there was no evidence adduced at trial to dispute Chartis's

admission that *Chartis itself*, the Defendant in this case, knew about the First

Federal Action while negotiating and eventually executing a settlement with Batoff

behind Charbonneau's back.

> **F.     Chartis Refuses to Settle without a Complete Release**
> **Against Future Claims by Charbonneau and Waives the**
> **Policy's Proof of Loss Requirement.**

In early September 2012, O'Keefe and Cohen met again, at a rest stop

on the Garden State Parkway, to continue discussing the potential lump sum

settlement. A799 (26:24-27:14); A2166. In approximately the same timeframe,

O'Keefe apparently asked Cohen to obtain Batoff's legal position on

Charbonneau's legal interests in the Chartis Policy, because on September 16,

2012, Cohen gave O'Keefe a letter from Batoff's counsel, Douglas Widin

("Widin") of Reed Smith LLP. A1553 (Cohen email); A1551-1552 (Widin letter).

Therein, Widin argued that Charbonneau had no interest in the proceeds of the

Chartis Policy. A1551-1552.

O'Keefe admitted that when he asked Cohen for the letter from

Batoff's counsel, he knew Cohen was exclusively representing Batoff. A805

(50:7-9). Two months earlier, O'Keefe had already determined that Charbonneau

had an insurable interest up to the amount of her $2.2 million deposit. A2163. In

the same timeframe Chartis became aware of the August 7, 2012 letter in which

Charbonneau exercised her option.  Supra pp. 11-12.

Despite this extensive knowledge, O'Keefe never sought

Charbonneau's position on her own interests in the policy proceeds.  A805 (51:1-

4).

Additionally, at some point during these negotiations Chartis

apparently waived Batoff's obligation to submit a sworn proof of loss (Chartis's

waiver was neither written nor apparent from O'Keefe's claims file).  A1210

(235:3-9).  Chartis's waiver relieved Batoff from disclosing in writing "the interest

of all others," most notably Charbonneau, "in the property."  A149 (Chartis Policy

language).  When Cohen was asked whether he told O'Keefe that Batoff did not

want to submit a proof of loss because it would trigger Charbonneau's Right to

Consent under the LOA, Cohen said "I may have.  I think I did."  A1247 (384:14-

24).  Resolving claims without proof of loss is exceedingly rare at Chartis—

Piotrowski, the Senior VP who manages 123 claims handlers, testified that he sees

this happen only 4-5 times per year.  A843 (203:1-2); A845 (213:14-17).[2]

---

[2] O'Keefe demanded proofs of loss for Charbonneau's contents claims and did not
pay until he received them.  A1599-1601, A600 (94:24-95:8).

**G.    The Chartis-Batoff Settlement Is Signed, and Chartis Wires Batoff $18.5 Million Three Days Later.**

After soliciting Widin's letter explaining Charbonneau's alleged lack of interest in the Chartis Policy proceeds, and choosing not to contact Charbonneau for a response, O'Keefe and Batoff, via Widin, agreed on the following settlement terms:

> 2. Batoff would "hereby release and forever discharge Chartis" from any claims he might have against Chartis relating in any way to Bloomfield.
>
> 4. Batoff would "indemnify [Chartis] against all … liabilities … incurred as the result of any claim … that may be asserted against [Chartis] by Topolinski and/or Charbonneau  … for proceeds of or payments pursuant to the [Chartis] Policy arising out of the [LOA] and/or the Option."
>
> 6. "Chartis waives and relinquishes in favor of Batoff any and all rights of subrogation … against any and all parties as a result of" the Chartis-Batoff Settlement … and will cooperate fully and completely with Batoff regarding any claims he may bring against third parties …. Batoff shall own and possess any and all rights of subrogation that did arise … in favor of Chartis …."

A224-229.  The settlement also acknowledged that "Charbonneau has contended she has an option to buy [Bloomfield]."  A224 (fifth WHEREAS clause).

In exchange for those terms, Chartis agreed to wire Batoff $18.5 million.[3]  On October 1, 2012, Batoff and Piotrowski of Chartis executed the Chartis-Batoff Settlement.  Chartis agreed to wire the money because Batoff "want[ed] the funds quickly," even though O'Keefe testified that paying clients by wire transfer was "unusual" and was "not a common practice for me at all."  A404. Right around the same time, Charbonneau's lawyer was seeking assurances that Batoff would not take any steps with respect to the insurance claim.  See, e.g., A1559-1560.

Despite counsel's efforts for such assurances, Charbonneau was never informed of the Chartis-Batoff Settlement until after Chartis wired the $18.5 million to Batoff.  The news came about two weeks later from her lawyers at Dechert, who Chartis and Batoff also intentionally kept in the dark about the negotiations prior to the settlement but who only subsequently learned of it (neither Chartis nor C&C ever told her).  A598 (88:7-16).

Prior to signing the Chartis-Batoff Settlement, neither O'Keefe nor anyone else at Chartis directly or indirectly sought Plaintiff's written consent to the Chartis-Batoff Settlement.  A805 (51:1-4).  Chartis failed to do this despite having

---

[3] Chartis had previously made advance payments to Batoff totaling approximately $2 million.

known for months about Charbonneau's Right to Consent to any resolution of Batoff's claim.  A1520.

Despite stating in writing only two months before the settlement that Charbonneau had an insurable interest in the Chartis Policy at least up to her $2.2 million in deposits, Chartis settled knowing that Charbonneau would receive nothing and Batoff would have $18.5 million to spend as he wished.  A2163. Chartis also chose not to institute an interpleader action, which would have escrowed the proceeds of the Chartis-Batoff Settlement for a court to resolve who owned them under the terms of the LOA.  By mid-October 2012, when Charbonneau learned of the Chartis-Batoff Settlement, Chartis had its complete release against future claims by Charbonneau and Batoff had his $18.5 million.

At trial, O'Keefe admitted that he did not keep detailed claims notes about the negotiation of the Chartis-Batoff Settlement.  A799 (28:14-23).  Most notably absent from O'Keefe's claims notes during the relevant period is any mention of Chartis's judicially admitted awareness of the First Federal Action. A1657.  There are also zero claims notes between mid-September and early October 2012—the height of the undisclosed negotiations between Chartis and Batoff.  Specifically, O'Keefe failed to note, among other developments: (1) the September 14, 2012 letter from Widin to him purporting to show Charbonneau's lack of insurable interest; (2) the multiple different drafts of the settlement

transmitted between Chartis and C&C/Widin; and, most notably (3) the Chartis-Batoff Settlement itself.

### H.    Two Months After the Chartis-Batoff Settlement, Batoff Uses Chartis's Subrogation Rights to File a RICO Lawsuit Against Charbonneau and Topolinski, and the Parties Eventually Settle both Prior Suits by Batoff.

On November 29, 2012, Batoff filed a second federal lawsuit against Charbonneau and Topolinski, captioned 12-cv-6673 (E.D. Pa.), in which he frivolously claimed that Charbonneau and Topolinski set the Bloomfield fire and therefore violated RICO (the "Second Federal Action"). A519-575. Chartis learned of the Second Federal Action several days later but concluded that there was "no action warranted at this time," because the "issue [was] being monitored by adj[uster] & counsel." A1578. O'Keefe knew that by transferring Chartis's subrogation rights to Batoff and agreeing to "cooperate fully and completely" with him, O'Keefe was potentially permitting Batoff to allege in public court filings covered by the news media that Charbonneau and Topolinski started the Bloomfield fire, even though Chartis had investigated and concluded that no one deliberately set the fire. A226; A801 (35:4-36:5); A1527 (O'Keefe claims note).

On April 5, 2013, Batoff, Charbonneau and Topolinski reached a settlement of the First and Second Federal Actions (the "Charbonneau-Batoff Settlement"). A1586-1594. The Charbonneau-Batoff Settlement provided that Charbonneau would receive $11 million of the $17.4 million that Batoff secured

through the secret Chartis-Batoff Settlement but had not already spent,[4] and title to the as-yet unrepaired Bloomfield.  A1587-1588 (¶¶ 1-2).  On May 6, 2013, nearly nine months after Charbonneau exercised her option and demanded a closing, the parties closed.  A350-358.

Title in hand, Charbonneau returned to Bloomfield to begin the work of reconstruction.  A600 (95:12-19).  She renewed earlier negotiations with multiple builders and oversaw efforts to salvage valuable components of Bloomfield.  A600-601 (95:20-99:10).  In the process, Charbonneau spent over $1 million to preserve Bloomfield and make it safe for additional work.  A601 (99:11-23).  Charbonneau later negotiated and signed a $42 million contract with Doozer Construction Co., for the rebuild that will go forward if she prevails in this action—an amount more than $20 million in excess of what Chartis paid Batoff for a complete release.  A602-603 (102:18-108:16), A1717-1726.

## II.    PROCEDURAL HISTORY.

Charbonneau commenced this action on July 25, 2013.  A-84-113. Chartis filed a motion to dismiss, D.E. 9, which the District Court denied.  D.E. 15. After limited discovery, Chartis filed a motion for summary judgment, D.E. 21, which the District Court also denied.  D.E. 49.  After additional discovery, Chartis

---

[4] Batoff paid C&C $1.1 million for their services shortly after Chartis wired the money.

filed a renewed motion for summary judgment.  D.E. 95 (opening brief), 109 (opposition), 119 (reply).  On June 30, 2015, the District Court granted Chartis's motion on Charbonneau's breach of contract, breach of implied covenant of good faith and fair dealing, statutory bad faith, and declaratory judgment claims.  A10-28.  The District Court denied summary judgment on Charbonneau's tortious interference with contract claim, A28-33, and the parties proceeded to trial on that claim.

The parties conducted a bench trial from August 5-13, 2015.  A576-1130 (full transcripts).  Both parties submitted proposed Findings of Fact and Conclusions of Law on August 24, 2015.  D.E. 212, 213.  On September 21, 2015, the District Court issued Findings of Fact and Conclusions of Law, A35-55, and entered judgment for Chartis.  A34.

## SUMMARY OF THE ARGUMENT
### ARGUMENT 1:  BREACH OF CONTRACT AND BAD FAITH

The first claim turns on whether the District Court erroneously concluded that Charbonneau was not assigned the proceeds of the Chartis Policy prior to Chartis secretly paying Batoff $18.5 million in exchange for a full release against subsequent claims by Charbonneau.  The District Court erred by misconstruing Paragraph 17 of the LOA, which confers upon Charbonneau the rights, in the event of a casualty like the Bloomfield fire, to: (a) exercise her option

20

to purchase and immediately be assigned Batoff's legal right to outstanding insurance proceeds; and (b) approve or reject any settlement of the homeowners claim.  A188.

      This Court should reverse the District Court for any of three reasons:

      <u>First</u>, the receipt of an "assignment" at closing in the context of Paragraph 17 unambiguously refers only to a written instrument memorializing the transfer of rights which had previously occurred by operation of law.  Paragraph 17 was drafted and inserted into the LOA by Charbonneau's lawyer to protect the nearly $2.2 million in deposits Charbonneau made prior to the LOA.  Paragraph 17 protects—not diminishes—that investment.

      Charbonneau's interpretation accords with the settled principle of Pennsylvania law that when insurance proceeds are transferred via exercise of a purchase option, ownership of the insurance proceeds relates back to the date the option was created.  <u>Shaffer v. Flick</u>, 520 A.2d 50, 51 (Pa. Super. 1993).  In this case, when Charbonneau exercised her option two months prior to the undisclosed Chartis-Batoff Settlement, ownership of the Chartis Policy proceeds retroactively transferred to Charbonneau by operation of law.

      Under the District Court's reading, however, this otherwise automatic transfer of rights does not occur until Batoff agrees to schedule a closing and the closing occurs.  In other words, Charbonneau's right to the Chartis Policy proceeds

could be delayed, potentially indefinitely, based on a clause inserted by her own lawyer.  Closing, of course, was an event which Batoff: (1) had the power to delay; (2) had a financial incentive to delay; and (3) did in fact delay until after receiving $18.5 million from Chartis and granting Chartis a full release.

Any interpretation other than Charbonneau's would eviscerate Pennsylvania law on the effect of exercising a purchase option, by pushing Charbonneau's receipt of the substantive assignment of rights back until after the closing, which Batoff could manipulate and delay.  The District Court's interpretation, that the "assignment" Charbonneau received "at closing" in Paragraph 17 was the actual transfer of the legal right to unpaid insurance proceeds, would yield a plainly "absurd and unreasonable outcome" and therefore was incorrect.  <u>Bohler-Uddeholm Am. Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 96 (3d Cir. 2001).  Accordingly, the receipt of an "assignment" referenced in Paragraph 17 can only reasonably refer to a written memorialization of the past transfer of unpaid insurance proceeds to Charbonneau, which is one of two settled definitions of the word.

<u>Second</u>, even if Charbonneau's interpretation of "assignment" is not the only reasonable one in this context, it is at least as reasonable as the alternative definition adopted by the District Court, that "assignment" means the substantive transfer of legal rights.  Two alternative reasonable definitions, which are clear

22

independent of any extrinsic evidence, would show that Paragraph 17 is patently ambiguous and should be addressed by a jury, not the District Court.

Third, even if the contract language on its face unambiguously supports Chartis's interpretation, extrinsic evidence of Charbonneau's and Batoff's intent in drafting the LOA strongly suggests that "assignment" was intended to mean the written memorialization of an earlier transfer of rights. At the very least, the word creates a latent ambiguity in Paragraph 17. Charbonneau submitted the Whitman Affidavit, completely uncontroverted by Chartis, explaining Whitman's intent that Paragraph 17 facilitate Charbonneau's receipt of proceeds, not undercut her automatic entitlement to those proceeds. The District Court rejected the Whitman Affidavit out of hand, but the District Court was legally required to at least consider it and any other extrinsic evidence submitted by either party. Had the District Court done so, it would have identified the latent ambiguity in "assignment" and denied summary judgment.

Finally, because Charbonneau's breach of contract and statutory bad faith claims were dismissed for the same reason, reversal on breach of contract requires reversal on bad faith as well.

## ARGUMENT 2: TORTIOUS INTERFERENCE WITH CONTRACT

The second dispute on appeal turns on: (1) whether Chartis, by engineering and facilitating the Chartis-Batoff Settlement, "intentionally …

induced" Batoff to breach the LOA, as that phrase is construed under Pennsylvania law on tortious interference with contract; and (2) whether Chartis was nonetheless privileged to procure a breach that would deplete the proceeds of its policy in exchange for a complete release against future claims by Charbonneau. The District Court erred by applying two incorrect legal standards when assessing Chartis's level of intent, each of which taints the District Court's factual findings and warrants reversal and remand.

First, the District Court disregarded the settled principle of Pennsylvania law that the defendant need not actually desire to harm the plaintiff in order to be guilty of tortious interference—if the defendant is "substantially certain" his acts will lead to a breach of contract, the intent element is met.

Second, the District Court built on its incorrect intent standard to argue that as a matter of law, a defendant cannot be liable for tortious interference with contract if the breaching third party independently intended to breach the contract. To the contrary, under Pennsylvania law a breaching third party's motive is, at most, one factor in the intent analysis.

Based on these two erroneous legal analyses, each subject to *de novo* review by this Court, the District Court's subsequent findings of fact on the intent and absence of privilege elements of tortious interference are irreparably tainted.

Accordingly, this Court should disregard those findings of fact and remand for a new trial.[5]

The evidence at trial shows that Chartis was, at a bare minimum, "substantially certain" that its acts would induce Batoff to breach. Chartis, by its own admission, knew that Charbonneau: (1) had exercised her option before the Chartis-Batoff Settlement; (2) intended to invoke the Chartis Policy's unlimited GRC Coverage; (3) was entitled to, at a minimum, Chartis Policy proceeds equal to her existing non-refundable deposits toward the purchase of Bloomfield; and (4) was entitled to approve or reject any settlement of the homeowners claim.

Only by settling with Batoff and receiving a complete release against future claims in exchange—in the process inducing Batoff to breach the LOA—could Chartis insulate itself from potentially significant financial liability to Charbonneau. Batoff could not have breached but for Chartis's money and its willing participation. Chartis, and *only* Chartis, was in a position to give Batoff what he needed to breach the LOA.

---

[5] If this Court remands for a new trial, the case would be heard by another judge, in light of the Honorable William H. Yohn, Jr.'s retirement.

## ARGUMENT 1:  THE DISTRICT COURT INCORRECTLY GRANTED SUMMARY JUDGMENT ON CHARBONNEAU'S BREACH OF CONTRACT AND BAD FAITH CLAIMS.

### STANDARD OF REVIEW

This Court exercises plenary review over the District Court's summary judgment ruling.  Coolspring Stone Supply v. Am. States Life Ins. Co., 10 F.3d 144, 146 (3d Cir. 1993).  This Court should not grant summary judgment "where there is the *slightest doubt* as to the facts."  Tomalewski v. State Farm Life Ins. Co., 494 F.2d 882, 884 (3d Cir. 1974) (emphasis added).  The Court should "review the facts in the light most favorable to the party against whom summary judgment was entered," id., in this case Ms. Charbonneau, and "resolve all factual doubts and draw all reasonable inferences" in her favor.  Suders v. Easton, 325 F.3d 432, 435 n. 5 (3d Cir. 2003).

### APPLICABLE LEGAL STANDARDS

Several well-settled canons of contract interpretation apply to Charbonneau's appeal.

First, whenever a contract is subject to multiple reasonable interpretations, it is ambiguous and the court should let a fact-finder resolve the ambiguity.  Allegheny Int'l v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994).  Two types of contractual ambiguity warrant denying summary judgment.

> Ambiguities may be either patent or latent.  A patent ambiguity appears on the face of the instrument and arises from the defective, obscure, or insensible language used.  Latent ambiguities arise from extraneous or collateral facts which render the meaning of a written contract uncertain although the language, on its face, appears clear and unambiguous.

Krizovensky v. Krizovensky, 624 A.2d 638, 643 (Pa. Super. Ct. 1993) (quotation omitted).

When assessing ambiguity, the court should consider the context in which a term is used.  Steuart v. McChesney, 444 A.2d 659, 662 (Pa. 1982).  Accordingly, the fact that a contract is facially unambiguous does not automatically bind the court to apply the plain language meaning:  "[I]f the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable, Pennsylvania contract law allows a court to construe the contract otherwise in order to reach 'the only sensible and reasonable interpretation' of the contract."  Bohler-Uddeholm, 247 F.3d at 96 (quoting United Ref. Co. v. Jenkins, 189 A.2d 574, 580 (Pa. 1963)).  If applying the plain meaning of the contract in a vacuum would plainly contradict the parties' intent, the court should consider an "alternative interpretation."  Id.

Second, when assessing a contract for ambiguity, a district court *must* consider extrinsic evidence submitted by the parties.  Id.  "It is the role of the judge to consider the words of the contract, the alternative meaning suggested by

27

counsel, and the nature of the objective evidence to be offered in support of that meaning." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). The court should also beware that "what may seem unambiguous without context (or in the context that the judge may hypothesize, based on his or her own experience) may be ambiguous when understood from the linguistic reference point of the parties." Am. Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995) (quotation omitted).

## I.  IN PARAGRAPH 17, RECEIPT OF AN "ASSIGNMENT" ON CLOSING UNAMBIGUOUSLY REFERS TO A DOCUMENT MEMORIALIZING THE PRIOR TRANSFER OF SUBSTANTIVE RIGHTS TO CHARBONNEAU.

The use of "assignment" in Paragraph 17 of the LOA can only be reasonably interpreted to refer to a written instrument memorializing the transfer of substantive insurance rights to Charbonneau by operation of law, not the transfer of rights itself. The legally operative transfer of rights occurred no later than when she exercised her option to purchase Bloomfield.

The word "assignment" has multiple distinct definitions:

An assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another; the term denoting not only the act of transfer, ***but also the instrument by which it is effected***. In these senses the word is variously applied in law.

Black's Law Dictionary (10th ed. 2014) (emphasis added).

> Assignment: Legal transference of a right or property;
> **the document that effects or authorizes the**
> **transference**.

Oxford English Dictionary, http://www.oed.com/view/Entry/11921 (last visited

Jan. 28, 2016) (emphasis added).

To determine the meaning of a particular contractual term, the court

should interpret it in the context of the entire contract. Commonwealth v. UPMC,

2015 Pa. LEXIS 2722, at *58 (Pa. Nov. 30, 2015) (quoting Pritchard v. Wick, 178

A.2d 725, 727 (Pa. 1962)). Therefore, to determine which of the two definitions of

"assignment" accords with the plain meaning of the LOA, this Court should

interpret the term in the context of the full relevant text of Paragraph 17:

> If the cost to repair any damage is more than $1,000,000
> [Charbonneau] may elect to exercise [her] Option, and
> shall be entitled to receive at closing a credit in the
> amount of any insurance proceeds paid to [Batoff], and
> an assignment [of] all of [Batoff's] rights to receive any
> unpaid proceeds. [Batoff] may make proof of loss;
> provided, however, that any adjustment of a proof of loss
> shall require the prior written consent of [Charbonneau],
> which shall not be unreasonably withheld or delayed.

A188.

While the two settled definitions of "assignment" could create

ambiguity in certain circumstances, in this instance Charbonneau's interpretation is

the only reasonable one. As reflected in the LOA, Charbonneau made over $2

million in non-refundable deposits toward the $5.2 million purchase price. As

29

Chartis knew, Paragraph 17 was included in the LOA to protect this investment.

A1520. Protecting Charbonneau's right to rebuild in the event of a casualty could

only be accomplished via the Chartis Policy's unlimited GRC Coverage for

insureds (or their assignees) who rebuild in the same physical location. A162.

If "assignment" in the LOA is understood to mean the written

memorialization of a transfer of substantive rights, Paragraph 17 can be read in

harmony with the settled principle that when an optionee exercise her option,

equitable ownership, including the right to insurance proceeds, is conferred

immediately and ownership relates back to the date the option was granted.

Shaffer, 520 A.2d at 51. If an "assignment" of the right to unpaid insurance

proceeds is defined as the transfer of substantive rights, on the other hand,

equitable ownership and the right to proceeds does not take effect until after a

future condition—closing—over which Charbonneau does not have control. In

other words, under this second definition, Paragraph 17 diminishes Charbonneau's

rights to less than what she would otherwise have been entitled under Pennsylvania

law. Any such interpretation is plainly unreasonable.

In Shaffer, two individuals leased a farm from their parents with a

purchase option. Id. at 50-51. The lessees had not exercised their option when a

fire destroyed the farm, killing the parent lessors. Id. at 51. The lessors' fire

insurer paid the policy proceeds to their estate, after which the lessees exercised

their option.  Id.  The estate administrator withheld the insurance proceeds and the

lessees filed suit.  Id.

   The Shaffer court held that the lessees became the equitable owners of

the insurance proceeds automatically upon exercising their option, retroactive to

the date the option was granted.  Id. at 51.  Discussing a factually similar

Pennsylvania Supreme Court case, the Shaffer court reiterated the settled rule:

> [U]pon exercise of the option, the equitable title of the
> lessee-optionee reverted back to the date of the original
> agreement, and the lessee-optionee became the owner as
> of that date, *or of the insurance money which stood pro
> tanto in its place*.

520 A.2d at 52 (quoting Peoples Street Ry. Co. v. Spencer, 27 A. 113, 114 (Pa.

1893) (emphasis added)).  The Court later reiterated the general rule again, with

the caveat that it applies "unless the parties provided otherwise in their agreement."

Id. at 52.

   Assuming that "assignment" is defined as Charbonneau contends,

Charbonneau and Batoff did not "provide otherwise in their agreement."

Paragraph 17 is a clarification of the process by which Charbonneau would receive

the Chartis Policy proceeds, rather than an attempt by Charbonneau's own lawyer

to throw up roadblocks preventing her from securing precisely the right to unpaid

policy proceeds she is entitled to by operation of Pennsylvania law.  This is the

only interpretation consistent with Shaffer.  Any other definition of "assignment"

would yield a result directly contrary to the overall purpose of Paragraph 17—to facilitate Charbonneau's rebuilding of Bloomfield in the event it suffered a casualty.  Especially in light of her non-refundable $2.2 million deposit, such a contrary result would clearly be "absurd and unreasonable."  Bohler-Uddeholm, 247 F.3d at 96.

The District Court erred by simply assuming that "assignment" in Paragraph 17 could only mean the transfer of substantive rights, without addressing Charbonneau's equally accepted alternative definition.  Accordingly, this Court should remand with instructions to enter partial summary judgment in Charbonneau's favor.[6]

## II.    IF CHARBONNEAU'S INTERPRETATION IS NOT THE ONLY REASONABLE ONE, "ASSIGNMENT" IS PATENTLY AMBIGUOUS.

A term is considered patently ambiguous if it "admit[s] of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time."  Mellon Bank, 619 F.2d at 1011.  At the very least,

_____

[6] District Courts in the Third Circuit are empowered to grant *sua sponte* summary judgment.  This is especially appropriate when one party has already moved for summary judgment and therefore is on constructive notice that the court could grant summary judgment for the non-moving party.  Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 224 (3d Cir. 2004).  In such circumstances, written notice from the court to the moving party is unnecessary.  Id.

Charbonneau has shown that "assignment" in Paragraph 17 can be "understood in more than one way," thus the term in context is patently ambiguous.

Black's Law and the Oxford English Dictionary establish beyond doubt that "assignment" has two meanings. <u>Supra</u> pp. 28-29. As applied, one definition would protect Charbonneau's $2.2 million investment, while the other would give Batoff license to keep that enormous deposit *and* all insurance proceeds, leaving her with nothing, despite the inclusion of Paragraph 17. If this Court holds it reasonable to interpret "assignment" in this context to be the transfer of substantive rights at a closing, that cannot be the only reasonable interpretation. The unqualified use of the term in Paragraph 17 would constitute the type of imprecise phrasing that "admit[s] of two or more meanings" and must be resolved by the fact-finder. <u>Mellon Bank</u>, 619 F.2d at 1011.

However, in this case the District Court simply failed to address the multiple settled definitions and the ambiguity arising therefrom. Accordingly, this Court should reverse the summary judgment grant and remand for further proceedings.

## III.    AT THE VERY LEAST, EXTRINSIC EVIDENCE DEMONSTRATES A LATENT AMBIGUITY.

Even if "assignment" in Paragraph 17 does not unambiguously support Charbonneau's position and is not patently ambiguous, this Court should consider whether Paragraph 17 contains a latent ambiguity. In assessing the

possibility of latent ambiguity, a court must consider any supporting extrinsic evidence. <u>Bohler-Uddeholm</u>, 247 F.3d at 96. Here, the Whitman Affidavit, which is entirely uncontroverted by Chartis, demonstrates the latent ambiguity.

### A.    Paragraph 17 Was Intended to Facilitate Charbonneau's Receipt of Insurance Proceeds.

As Chartis knew, Charbonneau had made over $2 million in non-refundable deposits toward the purchase of Bloomfield before the parties signed the LOA. A1517 (email to O'Keefe listing deposits). Whitman wanted Charbonneau's financial interest in the property to be ironclad in the event of a qualifying casualty under Paragraph 17. A452 (Whitman Aff.). Whitman understood that equitable ownership of property and insurance proceeds automatically transfers to an optionee upon exercising the option under Pennsylvania law, and "did not intend to lessen [Charbonneau's] rights under Pennsylvania law." A451.

Accordingly, Whitman drafted Paragraph 17 to facilitate Charbonneau's receipt of insurance proceeds in the event there was a casualty to Bloomfield and Charbonneau exercised her option. Batoff would be required to give Charbonneau "a document memorializing her assignment at closing, so that she would have documentation of the assignment to provide to the insurance company." A451. The assignment to be memorialized would have occurred by

operation of Pennsylvania law when Charbonneau exercised her option, effective as of the date of the LOA. Id.; Shaffer, 520 A.2d at 51.

Thus, the "assignment" referred to in Paragraph 17 means written documentation of a prior legal assignment, not an alteration of substantive legal rights. Whitman never intended that if the property suffered a casualty, Charbonneau could be left with no home *and* no insurance proceeds with which to rebuild it. Batoff, an experienced real estate lawyer, testified that he understood Paragraph 17 was inserted by Topolinski and Whitman on Charbonneau's behalf, to protect her interest. A438 (36:9-14).

## B. Chartis Has Offered No Competing Extrinsic Evidence.

In addition to being directly relevant, the Whitman Affidavit is *completely uncontroverted*. Affidavits executed during litigation are regularly deemed appropriate extrinsic evidence. See, e.g., Bohler-Eddeholm, 247 F.3d at 111-13 (Third Circuit relying on affidavit by president of company advocating alternative interpretation to find ambiguity); Sumitomo Mach. Corp. of Am. v. AlliedSignal, 81 F.3d 328, 335 (3d Cir. 1996) (ambiguity in settlement agreement based on conflicting affidavits from individuals involved in drafting agreement). Affidavits are especially persuasive extrinsic evidence when unopposed. John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 661 (3d Cir. 1986) ("Significantly, there was no rebuttal to [the Appellant's sworn affidavit].").

This Court is thus left to consider Whitman's word on the one hand against nothing on the other hand.  In light of this absence of competing interpretations, the notion that the *only* reasonable reading of "assignment" is that it refers to the legal transfer of substantive rights does not hold water.

## IV.    THE DISTRICT COURT MADE MULTIPLE REVERSIBLE ERRORS.

Based on the *de novo* standard of review, this Court need not affirmatively address the District Court's opinion.  Nonetheless, the District Court's errors shed further light on why this Court should accept Charbonneau's interpretation of "assignment" in Paragraph 17.

While the District Court was not required to find a latent ambiguity in Paragraph 17 just because Charbonneau suggested it should, the District Court *was* required to at least consider the Whitman Affidavit.  Bohler-Uddeholm, 247 F.3d at 96.  The District Court, however, explicitly declined to do so, instead simply referencing the existence of the affidavit but concluding without further elaboration that "Pennsylvania law presum[es] that the writing conveys the parties' intent."  A19 (quotation omitted).  Courts *must* at least consider whether extrinsic evidence submitted by the parties suggests ambiguity; to do otherwise is reversible error.  Id.  If the District Court had considered the Whitman Affidavit, the latent ambiguity in "assignment" would have been undeniable.  Instead, the District Court decided—without actually stating—that the only reasonable interpretation of

36

"assignment" in Paragraph 17 is by reference to the substantive transfer of legal

rights. Even if the District Court's interpretation of Paragraph 17 was reasonable,

which Charbonneau disputes, it surely is not the *only* reasonable interpretation.

Rather than focusing upon the issue of when the right to unpaid

proceeds was assigned to Charbonneau, the District Court focused on when a

"closing" occurred, implicitly concluding that that substantive right could only be

conveyed at closing. The District Court determined that "closing" unambiguously

refers to the transfer of title, thus there could be no assignment of Batoff's rights

under the Chartis Policy until Batoff formally transferred the deed to Charbonneau

(after the clandestine Chartis-Batoff Settlement). But the question Charbonneau

raised in her opposition was not what "closing" means—it was what the

"assignment" that occurred at closing actually consisted of. The District Court

simply failed to address the most important question.[7]

## V.  IF THIS COURT REVERSES THE BREACH OF CONTRACT RULING, IT SHOULD ALSO REVERSE THE STATUTORY BAD FAITH RULING.

The District Court granted summary judgment on Charbonneau's 42

Pa.C.S. § 8371 claim on the basis that Batoff's rights and obligations were not

---

[7] Moreover, the District Court denied Chartis's first motion for summary judgment based on the presence of numerous issues of fact, D.E. 49, and the only material new evidence submitted during the briefing of Chartis's renewed summary judgment motion was the Whitman Affidavit, which the District Court disregarded.

assigned to Charbonneau until closing, and at closing Batoff undisputedly had nothing left to assign.  Therefore, the District Court held, Charbonneau's bad faith claim also must fail.[8]

If this Court agrees with Charbonneau that the assignment of Batoff's legal rights to the Chartis Policy at least might have occurred before the Chartis-Batoff Settlement, by the same token Chartis's handling of her claim may have been in bad faith—particularly since Chartis paid $18.5 million to Batoff while knowing that Charbonneau had exercised her purchase option, and having previously admitted she had an insurable interest in the property.  Accordingly, a ruling in Charbonneau's favor on the breach of contract claim should lead to reinstatement of the bad faith claim as well.

## ARGUMENT 2:  THE DISTRICT COURT INCORRECTLY ENTERED JUDGMENT FOR CHARTIS ON CHARBONNEAU'S TORTIOUS INTERFERENCE WITH CONTRACT CAUSE OF ACTION.

### STANDARD OF REVIEW

This Court should "exercise plenary review over a trial court's conclusions of law … [and] its choice and interpretation of legal precepts."  Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 515 (3d Cir. 2012) (quotations omitted).

---

[8] The District Court went further and conducted a *sua sponte* factual analysis of Charbonneau's bad faith claim.  A27-28.  This should be rejected, as the parties did not brief the substantive merits of a bad faith claim and that issue was not appropriate for resolution on summary judgment anyway.

nydocs1-1061264.6

The District Court holdings being appealed are deficient *as a matter of law* and therefore subject to plenary review.  Although a district court's factual findings generally receive a more deferential "clear error" standard of review, Post, 691 F.3d at 515, that deference is irrelevant if the factual findings are "predicated on a misunderstanding of the governing rule of law."  Bose Corp. v. Consumers Union, 466 U.S. 485, 501 (1984).

## I.    PLAINTIFF MET ALL ELEMENTS OF TORTIOUS INTERFERENCE WITH CONTRACT, BUT THE DISTRICT COURT APPLIED THE INCORRECT LEGAL STANDARDS.

To prove tortious interference with contract, Plaintiff must show:  (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to interfere with that contractual relationship; (3) the absence of privilege or justification for such interference; and (4) damages resulting from the defendant's conduct.  Triffin v. Janssen, 626 A.2d 571, 574 (Pa. Super. Ct. 1993).  The second and third elements, intent and absence of privilege, are "closely related" and often analyzed jointly.  Glenn v. Point Park College, 272 A.2d 895, 899 (Pa. 1971).

The District Court, in applying the intent element, made two reversible errors, each subject to plenary review by this Court.  First, the District Court disregarded the definition of "intent" that must be applied in Section 766 of the Restatement (Second) of Torts (the "Restatement"), which has been expressly incorporated into Pennsylvania law.  Adler, Barish, Daniels, Levin & Creskoff v.

Epstein, 393 A.2d 1175, 1183 (Pa. 1978).  Under that definition, "intent"

encompasses consequences the actor believes are "substantially certain to result

from" his acts.  Restat 2d Torts § 8A.  Section 8A is not optional—wherever

"intent" appears in the Restatement, the Section 8A definition must be used.  The

District Court failed to do that, and as a result weighed Charbonneau's evidence

against an artificially strict legal standard.

Second, the District Court incorrectly held that plaintiffs in tortious

interference cases must show that the breaching third party did not independently

intend to breach its contract with the plaintiff.  A49 (¶ 72).  While the breaching

third party's intent may be relevant when assessing whether the defendant itself

had the requisite intent, there is no support in the case law for a hard-and-fast rule

that a plaintiff can only prove tortious interference if she first proves the breaching

third party's innocence.  This purported "rule," for which the District Court cited

no authority, would narrow the tort of tortious interference to instances of outright

coercion, which finds no support in the law.

Based on these two errors of law, the District Court's factual findings

as to Chartis's intent to induce Batoff's breach of the LOA should be disregarded.

The same is true of the District Court's factual findings on absence of privilege, the

"closely related" third element of tortious interference.  Accordingly, this Court

should remand for a new trial applying the correct legal standards.

**A.    The Lease Option Agreement Was a Contractual Relationship between Charbonneau and Batoff.**

As the District Court correctly held, the LOA was a "contractual relationship" between Charbonneau and Batoff.  A46 (¶ 68).

**B.    The District Court Applied the Incorrect Intent Standard; Under the Correct Standard, Chartis Knew Batoff's Breach Was "Substantially Certain to Result" from Chartis's Conduct.**

Close review of the District Court's intent analysis reveals the District Court's misimpression that Charbonneau believed she only needed to show Chartis intended to "enable" Batoff's breach.  However, the correct legal standard is whether Chartis "induced" the breach, and Charbonneau never argued otherwise. The question left unaddressed by the District Court is *what "induce" actually means* under Restatement Section 766.

      1.    <u>A Defendant May "Induce" a Breach of Contract by Knowing the Breach Is "Substantially Certain to Result" from the Defendant's Acts.</u>

      (a)    The District Court Ignored a Mandatory Restatement Provision Qualifying Section 766.

The District Court correctly looked to Restatement Section 766 to ground its formulation of the intent element.  Indeed, in light of the Pennsylvania Supreme Court's incorporation of Section 766 into Pennsylvania law, <u>Epstein</u>, 393 A.2d at 1183, it is not an optional reference point.  Excerpted for clarity, the section reads as follows:

> One who *intentionally* and improperly interferes with the
> performance of a contract … by *inducing* … the third
> person not to perform the contract, is [liable for tortious
> interference].

Restat 2d Torts § 766 (emphasis added).  The District Court rested its holding on a

plain language analysis of "induc[e]" but looked past the independent requirement

that the inducement be "intentional[]."  This is the first fatal flaw in the District

Court's reasoning, because any time the concept of "intent" appears in the

Restatement, the court is obligated to use the Section 8A definition:

> The word 'intent' is used throughout the Restatement of
> [Torts] to denote that the actor desires to cause
> consequences of his act, *or that he believes that the
> consequences are substantially certain to result from it*.

Restat 2d Torts § 8A (emphasis added).

Incorporating Section 8A into the "intentionally" piece of Section 766

and the Black's Law definition of "inducement" into the "inducing" piece of

Section 766 makes the correct standard much clearer:

> One who, [desiring the consequences of his acts or being
> substantially certain of the consequences that will result
> from his acts,] interferes with the performance of a
> contract by [enticing or persuading] the third party not to
> perform the contract, is [liable for tortious interference].

Accordingly, a defendant can be guilty of tortious interference if he is

"substantially certain" (§ 8A) that his conduct will "entic[e] or persuad[e]"

(Black's Law) the third party to breach his contract, even if he does not expressly

desire to harm the plaintiff.  Interpreting Section 766 any other way, as the District

42

Court did, would read Section 8A out entirely.  Because the Pennsylvania Supreme

Court incorporated Section 766 into Pennsylvania law, the District Court did not

have the discretion to simply opt out of Section 8A's "substantially certain"

formulation of intent.

(b)    Pennsylvania Case Law Overwhelmingly Supports Charbonneau.

The District Court did not cite a single case stating or implying that

the "substantially certain" standard of Section 8A can be read out of the intent

element of tortious interference.[9]  Indeed, there is no such case.  In Windsor

Securities, Inc. v. v. Hartford Life Ins. Co., the court explained at length the

difference between actual desire to harm and the more lenient "substantial

certainty" of breach standard.  No. 90-cv-3687, 1991 U.S. Dist. LEXIS 7072 (E.D.

Pa. May 20, 1991).  Windsor Securities featured a plaintiff investment advisor who

traded annuities created and regulated by the defendant life insurance company.

Id. at *1-2.  After achieving significant success for his clients, the defendant

informed the plaintiff that it was instituting new regulations that would impinge on

the plaintiff's investment strategy.  Id. at *7.  The advisor sued the insurance

company for tortious interference.

---

[9] The District Court cited only two cases in its discussion of the intent element. Those cases bear on whether a party can tortiously interfere with a contract if the third party also desires to breach it, a separate point of law addressed infra pp. 47-50.

43

The court, after quoting Section 8A, concisely distinguished actually intending harm from being "substantially certain" a breach of contract will result from one's acts:

> [U]nder the approach of the Restatement (Second) which has been adopted by the Pennsylvania Supreme Court in such intentional interference cases, Hartford need not have intended to deliberately harm Windsor as long as Hartford knew that its action was substantially certain to interfere with Windsor's contractual relations with its clients.  The record of this case indicates that Hartford had every reason to know that its actions … would interfere with Windsor's contractual relations with its clients.

Id. at *13-14; see also Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div., 422 A.2d 611, 622 n. 11 (Pa. Super. 1980) (plaintiff can prove intent without showing "malevolent spite by defendant.").

Like the defendant in Windsor Securities, Chartis indisputably knew Batoff would breach the LOA based on Chartis's offer of an $18.5 million walkaway settlement.  Chartis admitted that it knew about the litigation between Batoff and Charbonneau over Charbonneau's exercise of her option.  Supra pp. 11-12.  Chartis knew Charbonneau would invoke the Chartis Policy's unlimited GRC Coverage if allowed to participate in the claim and would never consent to a lump sum settlement like the one offered to Batoff by Chartis.  A838 (184:18-185:24).  O'Keefe himself acknowledged in writing that the cost to rebuild Bloomfield could be as high as $30 million, demonstrating his awareness of the millions Chartis

44

potentially stood to save by settling with Batoff for $18.5 million.  A2163.

Moreover, Charbonneau contends that rebuilding would cost approximately $42

million, and recently signed a binding contract to that effect.  A1717-1726.

The defendant in Windsor Securities appealed and this Court reversed,

but exclusively as to the absence of privilege element.  Windsor Secur., Inc. v.

Hartford Life Ins. Co., 986 F.2d 655 (3d Cir. 1993).  With respect to intent, this

Court simply recognized that the district court found the requisite intent, and

moved on.  The district court opinion in Windsor Securities is therefore good law.

There are myriad other Pennsylvania state and federal cases

incorporating the "substantially certain" threshold into the Section 766 analysis,

but the District Court did not address any of them.  See, e.g., Synthes, Inc. v.

Emerge Med., Inc., 25 F. Supp. 3d 617, 729 (E.D. Pa. 2014) ("The question now

becomes whether [defendant] … acted in a manner where interference was certain

or substantially certain to occur as a result of [defendant's] conduct."); Eagle v.

Morgan, No. 11-cv-4303, 2011 U.S. Dist. LEXIS 147247, at *41 (E.D. Pa. Dec.

22, 2011)  ("Interference is intentional when the actor … knows that the

interference is certain or substantially certain to occur as a result of his action.")

(quotation omitted); Total Care Sys. v. Coons, 860 F. Supp. 236, 241 (E.D. Pa.

1994) ("As with intentional torts generally, intent in this case may be shown where

the actor knows an injury is certain or substantially certain to occur as a result of his action.").

Another Third Circuit decision interpreted the intent standard to mean that the defendant's "activities [must have] contributed in a material and substantial way" to [the breach of contract] and been "a factor without which [the breach] would not have occurred." Avins v. White, 627 F.2d 637, 650 (3d Cir. 1980). This focus on the defendant's role in facilitating the third party's breach applies perfectly here. Regardless of whether Chartis pressured Batoff to settle or vice versa, Batoff indisputably could not have breached the LOA without Chartis's financial backing. Chartis—and *only* Chartis—could offer Batoff more than three times what he was planning to sell Bloomfield for (in order to avoid Chartis having to cover Charbonneau under the unlimited GRC Coverage), giving Batoff a reason to breach the LOA.

       (c)    **The District Court Erroneously Based Its Decision on a Dichotomy Between "Intent to Enable" and "Intent to Induce."**

The District Court erroneously dispatched Charbonneau's intent argument in one footnote, explaining that

> [e]ven assuming (1) that plaintiff is correct [about how to define intent], and (2) that settling the homeowner's claim without proof of loss breached the LOA, Charbonneau has at most proven Chartis's intent to enable breach, not its intent to induce breach."

A50 (¶ 72 n. 3).

The foregoing discussion of Restatement Sections 766 and 8A, however, demonstrates that the question is not whether Chartis intended to "enable" or intended to induce (indeed, Charbonneau never suggested that she need only prove Chartis "enabled" Batoff's breach). The question is whether, applying the prescribed definition of intent, Chartis "intentionally … induc[ed]" Batoff to breach, Restat 2d Torts § 766, and that definition requires incorporation of the substantial certainty standard from Section 8A.

> 2. Whether Batoff Wanted to Breach the LOA Does Not Alter the Fact that Chartis Was "Substantially Certain" He Would Do So.

According to the District Court, Charbonneau cited no authority "for the proposition that a defendant can be found to have 'induced' breach even where the third party independently intended to breach the contract all along." A50 (¶ 72). The District Court's reasoning puts an unfounded burden on Charbonneau. Neither the District Court nor Chartis has offered case law stating or even implying that a defendant cannot tortiously interfere with a contract if the third party independently wants to breach it.

The limited case law explicitly addressing the issue in fact suggests the opposite—that a party can be liable for tortious interference even if the third party independently wanted to breach. The third party's intent is, at most, one factor to consider when determining whether the defendant possessed the requisite

47

intent for tortious interference. There are relatively few cases explicitly addressing this point not because it is an unsettled question, but because the answer is so self-evident that courts rarely see the need to discuss it. Thus, the District Court erred by putting on Charbonneau the nearly impossible burden of overcoming this purported rule, when in fact there is no such rule under applicable law. Moreover, as a matter of common sense, Batoff could not have independently "intended" to breach. He could only breach if Chartis wanted him to, because a breach would require Chartis's financial participation through payment of $18.5 million, and no one else could fill Chartis's role.

In <u>Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.</u>, the breaching third party affirmatively contacted the defendant, rather than vice versa. 592 F. Supp. 127, 131 (M.D. Pa. 1984). The third party wanted to sell someone else tires that he was contractually obligated to sell to the plaintiff, but first he needed a buyer. <u>Id</u>. Only *after* the third party contacted the defendant-buyer did the defendant decide to purchase the cut rate tires and thereby passively facilitate the third party's breach of contract. <u>Id</u>. Despite there being no question that the defendant was not the initial bad actor, the court still found the defendant guilty of tortious interference. <u>Id</u>. at 139.

Even assuming the facts are exactly as argued by Chartis—namely that Chartis never contemplated a lump sum settlement that could save it millions

of dollars until Batoff demanded it—Chartis can still be liable for tortious interference based on the reasoning of <u>Reliable Tire</u>. Regardless of who raised the idea first, who pressured who to finalize the terms, etc., Batoff indisputably could not have breached the LOA without Chartis's knowing facilitation.

The District Court's discussion of <u>Reliable Tire</u> collapses the District Court's two distinct errors of law (the incorrect general intent definition and the manufactured rule that a breaching third party's motive is dispositive) into one in order to reach its desired conclusion. Rather than explaining how the case supports its rule regarding the breaching third party's intent, the District Court avoided the issue and refocused on whether "intent" in Section 766 needs to include the "substantially certain" language of Section 8A. A48. But the general intent definition does not refute <u>Reliable Tire</u>'s holding that the breaching third party's independent intent is not dispositive.

In any event, independent of the District Court's lack of supporting authority, the notion that the breaching third party's intent always trumps the defendant's tortious conduct defies common sense. Defendants generally induce breach by offering the third party some financial incentive. Once aware of that financial incentive, the third party naturally develops its own intent to breach. Even if the third party had not planned to breach the contract before being

contacted by the defendant, it would still be nearly impossible for the plaintiff to prove that the third party did not develop its own intent to breach the contract.

The pertinent inquiry, disregarded by the District Court, is the defendant's role in *creating* the third party's intent to breach. Chartis's theory of the case depends on the notion that Batoff independently wanted to breach the LOA, but Chartis ignores that *the only way Batoff could breach the contract is if Chartis agreed to a lump sum settlement with him.* He wanted to breach because he and Chartis together realized they could both greatly benefit by trying to manipulate the LOA's language—Batoff would walk away from his destroyed former home with more than three times its listing price, while Chartis would insulate itself from Charbonneau and the additional millions it would have to pay her under the GRC Coverage if she were to rebuild her home. A838 (184:18-185:24). Indeed, it is no coincidence that Batoff's July 25, 2012 letter purporting to void the LOA came just three weeks after O'Keefe and C&C—acting exclusively for Batoff—began discussing settlement.

3.    Based on the District Court's Erroneous Legal Standards, the District Court's Factual Findings on Intent Must Be Disregarded or Reviewed Under a *De Novo* Standard of Review.

Because the District Court applied incorrect legal standards, this Court should either: (a) remand for further proceedings according to the correct legal standard; or (b) review the evidence *de novo* and make its own factual findings on

50

whether Charbonneau met the (correctly interpreted and applied) elements of tortious interference.  See, e.g., Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004) (finding district court applied overly deferential judicial review of agency action and remanding for new trial on the merits); Bose Corp., 466 U.S. at 501 (an appellate court has the "power to correct … a finding of fact that is predicated on a misunderstanding of the governing rule of law.").

Whether this Court remands or makes its own factual findings, the District Court's factual findings should be disregarded.  Therefore, the "clear error" standard generally accorded to factual findings is irrelevant.

### C.     Assuming Actual Breach Is a Requirement for Tortious Interference, Batoff Did Breach the LOA.

In addition to its two legal errors with respect to the intent analysis, the District Court erred as a matter of law a third time when interpreting the text of Charbonneau's Right to Consent, the LOA term Batoff breached by signing the Chartis-Batoff Settlement.  Chartis never contended that Batoff did not breach the LOA, but the District Court argued sua sponte that Batoff may not have actually breached when he signed the Chartis-Batoff Settlement.  A50-51 (¶¶ 73-74). Whether a tortious interference plaintiff needs to prove an actual breach of contract is not settled under Pennsylvania law, Total Care Sys., 860 F. Supp. at 242, but for purposes of explaining the District Court's legal error, we will assume it is required.

By signing the Chartis-Batoff Settlement, Batoff breached Charbonneau's Right to Consent to any resolution of his insurance claim under Paragraph 17 of the LOA. The District Court, however, concluded that the Right to Consent only applies to "adjustment of a proof of loss." A50 (¶ 73). Since the Chartis-Batoff Settlement took the form of a "Policyholder Release" and Batoff never submitted a document titled "Proof of Loss," the District Court continued, Batoff was free to rob Charbonneau of the Chartis Policy proceeds without even breaching the LOA. Id.

"[I]f the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable, Pennsylvania contract law allows a court to construe the contract otherwise in order to reach 'the only sensible and reasonable interpretation' of the contract." Bohler-Uddeholm, 247 F.3d at 96 (quoting United Ref. Co., 189 A.2d at 580). If applying the plain meaning of the contract in a vacuum would yield a result plainly contrary to the parties' intent, the court should adopt an "alternative interpretation." Id.

The District Court erred as a matter of law when interpreting Charbonneau's Right to Consent under Paragraph 17, for two reasons. First, Paragraph 17 sets forth the *only* thing Batoff is entitled to do with respect to a claim under the Chartis Policy—submit a proof of loss—in which case Chartis or Batoff must secure Charbonneau's written consent to any adjustment of that proof

of loss.  Otherwise, Charbonneau was to have complete control of the homeowners

claim.  In other words, Paragraph 17 does not entitle Batoff to do whatever else he

wants with his insurance claim, without informing Charbonneau, just because he

does not file a proof of loss.  It would be "absurd and unreasonable" to read

Paragraph 17, which was inserted by Charbonneau's lawyer for her own

protection, to mean that Batoff gets free rein over the homeowners claim just

because he and Chartis agree that Chartis will waive the nearly universal proof of

loss requirement.

Second, the District Court interprets the phrase "proof of loss" unduly

narrowly.  A proof of loss is merely a written statement memorializing the details

of an insurance claim.  3-20 New Appleman on Insurance Law Library Edition §

20.01 (2015).  Under the circumstances of this case, the proof of loss was

incorporated into the settlement agreement between Chartis and Batoff.  To

consider that document a release but not also a proof of loss, as the District Court

did, elevated form over substance.

By endorsing Chartis's tactic, the District Court turned a blind eye to

the sheer absurdity of the result arising from this narrow interpretation of "proof of

loss."  The District Court determined that as long as Chartis and Batoff agreed

Batoff would not submit a document with the words "Proof of Loss" on top,

Charbonneau's Right to Consent—and with it her entire ability to rebuild

Bloomfield—was moot.  This is so, according to the District Court ruling, despite

Charbonneau's *uncontroverted* evidence that Paragraph 17 was inserted to confer

control over insurance claims upon Charbonneau.

Accordingly, the District Court's interpretation of the Right to

Consent in Paragraph 17 yielded an "absurd and unreasonable outcome."  This

constitutes an independent reversible error.

**D.    The District Court's Legal Errors Regarding "Intent" Invalidate Its Factual Findings on Absence of Privilege.**

Absence of privilege, the third element of tortious interference, "is

closely related to the issue of intent to harm and has not been precisely defined."

Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc., No. 00-cv-3683, 2001

U.S. Dist. LEXIS 10709, at *9 (E.D. Pa. July 26, 2001); Glenn, 272 A.2d at 899.

To potentially be privileged, the defendant must "believe[] in good faith that his

legally protected interest may otherwise be impaired by the performance of the

contract."  Schulman v. J.P. Morgan Inv. Mgmt., 35 F.3d 799, 810 (3d Cir. 1994).

Even if the defendant has a contractual right to do something, as under the terms of

an insurance policy, it must independently be done in good faith.  Velocity Int'l,

Inc. v. Celerity Healthcare Sols., Inc., 846 F. Supp. 2d 332, 376 (W.D. Pa. 2011)

(citing Schulman, 35 F.3d at 810).

Since a defendant's actions can only be privileged if taken in good faith, whether the defendant had the requisite "intent" to induce breach bears on whether its acts are privileged.  If the defendant only needs to be substantially certain of the breach (rather than actually intend harm) to have sufficient intent, it becomes easier to show that the defendant was not acting in good faith and accordingly was not privileged.  That conceptual overlap, and the fact that absence of privilege "admits of no precise definition," explains why the two elements, though nominally separate, are "closely related."  Advent Sys. v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991).

Fittingly, Pennsylvania courts regularly conduct one joint analysis for intent and absence of privilege.  See, e.g., Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc., No. 00-cv-3683, 2001 U.S. Dist. LEXIS 10709, at *11 (E.D. Pa. July 26, 2001) (finding material issues of fact on intent and absence of privilege based on one analysis).

Despite this overlap, the District Court called Charbonneau's failure to prove absence of privilege an "independently sufficient  basis" for its decision. A54 (¶ 79).  However, the District Court's factual findings on absence of privilege are "closely related" to its factual findings on intent, therefore this Court should disregard them.

nydocs1-1061264.6

**E.    If Charbonneau Can Show the Other Elements of
Tortious Interference, that Will Automatically Show
that Chartis Caused Her Damages.**

The District Court did not address the damages element in detail.  If

Charbonneau proves Chartis intentionally and without privilege interfered with the

LOA, Charbonneau will automatically also prove that the damages she

indisputably suffered, namely her inability to rebuild Bloomfield, resulted from

Chartis's tortious interference.

**II.    EVEN ASSUMING THE DISTRICT COURT APPLIED THE
CORRECT LEGAL STANDARDS, ITS FINDINGS OF FACT
ARE CLEARLY ERRONEOUS AND SHOULD BE REVERSED.**

Even if the District Court applied the correct legal standards, it still

committed clear error by ruling that Charbonneau did not show the requisite intent

and absence of privilege.[10]

**A.    Chartis Wanted Batoff to Breach the LOA, Because
Chartis Knew the Breach Could Save Chartis
Millions in GRC Coverage that It Otherwise Owed to
Charbonneau.**

Chartis's intent to induce Batoff's breach of contract has its genesis in

three undisputed facts.  First, it is undisputed that Batoff did not intend to rebuild

Bloomfield and would release Chartis from its policy in exchange for a cash

_____

[10] The District Court found a contractual relationship between Batoff and
Charbonneau (Element 1) and did not reach damages (Element 4), therefore this
section focuses on intent (Element 2) and absence of privilege (Element 3).

settlement, because that is exactly what Batoff did.  <u>Second</u>, it is undisputed that

Charbonneau did intend to rebuild Bloomfield and would only have agreed to

resolve the homeowners claim in a manner that would enable her to rebuild—

namely via the unlimited GRC Coverage.[11]  <u>Third</u>, even Chartis admitted that

rebuilding Bloomfield could cost millions more than the eventual Chartis-Batoff

Settlement amount.  A2163 (D-097).

      As of his July 6, 2012 meeting with C&C, O'Keefe had learned of all

three of those facts.  At that time, O'Keefe and C&C began discussing a private

settlement between Batoff and Chartis for a figure in the area of $20 million, less

than the policy's replacement cost limit.  Chartis, by its own admission, learned

shortly thereafter that Charbonneau had exercised her option and Batoff had sued

her seeking  a declaration that the option was void.  <u>Supra</u> pp. 11-12.  Chartis

cannot reasonably dispute that it knew Charbonneau believed she had some sort of

interest in the Chartis Policy proceeds.  The Chartis claims file states that she had

an insurable interest in over $2 million in deposits she paid to Batoff, A2163, and it

---

[11] O'Keefe's trial testimony alleging that he did not know of Charbonneau's rebuilding plans is directly contradicted by his own deposition testimony. <u>Compare</u> A838 (184:23-24) (Q: [Y]ou did not know [she wanted to rebuild]?  A: I did not know.); <u>with</u> A838 (185:14-19, deposition testimony read at trial) (Q: Did you understand … that Ms. Charbonneau was very interest[ed] in restoring the home to its former state?  A: Yes…, I think she loved the property.").

was *Chartis* that required that the Chartis-Batoff Settlement provide for Batoff to indemnify Chartis against any future claim by Charbonneau.  A225-226 (¶ 4).

Regardless of whether Chartis had ill will toward Charbonneau, Chartis's plan could not go forward unless Batoff breached Charbonneau's Right to Consent by settling without informing her.  Chartis may have been focused on its own financial gain, making Charbonneau's loss simply collateral damage, but that does not matter.  See Yaindl, 422 A.2d at 622 n. 11 ("malevolent spite by defendant" not necessary).  What matters is that Chartis could not wash its hands of Batoff's Bloomfield claim without a release from him against future claims by Charbonneau—and to give Chartis that release, Batoff would breach the LOA.  Even if it was Batoff pushing Chartis to settle, Chartis cannot argue with a straight face that it settled with Batoff simply because he demanded it, independent of the positive financial ramifications for Chartis.  Indeed, Batoff never submitted a formal claim to Chartis or made a demand for payment.

Accordingly, if this Court determines that the correct intent standard was applied and reviews the District Court's findings for "clear error," the District Court should still be reversed.

**B.    Chartis Repeatedly Acknowledged Charbonneau Had an Interest in the Chartis Policy But Then Settled without Informing Her, Violating "the Rules of the Game."**

Whether a defendant's conduct is privileged depends on if it violates "the rules of the game which society has adopted." Glenn, 272 A.2d at 899 (quotations omitted). That a defendant "acted to protect a legitimate business interest" is not enough; the defendant's actions also "must not be improper." Empire Trucking Co. v. Reading Anthracite Coal Co., 71 A.3d 923, 935 (Pa. Super. Ct. 2013). A defendant's conduct is only privileged "when the actor believes in good faith that his legally protected interest may otherwise be impaired by the performance of the contract." Schulman, 35 F.3d at 810.

Chartis argued that its business relationship with Batoff obligated it to secretly settle with Batoff. However, no duty to Batoff required Chartis to do any of the following:

- Settle without securing Charbonneau's consent as a party with an insurable interest of at least $2 million and a contractual right to approve any claim settlement (A2163);

- Settle without following its regular practice of requesting a sworn proof of loss, so that Batoff could argue he did not breach Paragraph 17, which requires Charbonneau's approval of any proof of loss (supra p. 14);

- Make payment within three days by wire transfer at a time when it knew Charbonneau had exercised her option and was pursuing her right to the insurance proceeds, and when wire transfers were very rare at Chartis (supra pp. 15-16);

59

- Keep the settlement negotiations secret when it admitted Charbonneau had an insurable interest and knew of her contractual Right to Consent to any settlement.  In that regard it was clear to Chartis that C&C had not informed Charbonneau about the settlement negotiations, because C&C was negotiating only on behalf of Batoff and presented Chartis with a letter from Batoff's lawyer asserting that Charbonneau had no rights (A1551-1552);

- Transfer its subrogation rights to Batoff and agree to "cooperate fully and completely" with him, with the understanding that Batoff would use those rights to allege arson against Charbonneau (A801 (35:4-36:5); A226).

For those reasons and the others detailed below, Chartis violated the "rules of the game."

     1.    <u>Chartis Knew There Were Competing Claims to Its Policy Proceeds and Should Have Instituted an Interpleader Action.</u>

"Any entity potentially subject to multiple claims for the same money can file an interpleader action if the claimants "are claiming *or may claim*" to be entitled to such money …."  28 U.S.C. § 1335(a)(1) (emphasis added); <u>see</u> <u>also</u> Pa. R.C.P. No. 2303 ("claimant has made *or is expected to make* a demand …") (emphasis added).  In other words, the defendant need not have received express claims from both parties to justify an interpleader action.

"Rival claims against an insurer for insurance proceeds is a classic candidate for interpleader."  <u>Lewandowski v. Life Ins. Co.</u>, 608 A.2d 1087, 1088 (Pa. Super. Ct. 1992).  "An interpleader's purpose is the avoidance of the expense and inconvenience which results from the defense of multiple actions arising out of

identical claims of entitlement to a 'stake' of money, property or debt." Id. "[T]he chief beneficiary of an interpleader action is the insurance company," Hauger v. John Hancock Life Ins. Co., (U.S.A.), No. 07-cv-1711, 2008 U.S. Dist. LEXIS 8413, at *11 (M.D. Fla. Feb. 5, 2008), because it avoids additional litigation—just the sort of litigation that gave rise to this appeal. Insurance companies "often file[]" interpleader actions in such circumstances. In re Dow Corning Corp., 198 B.R. 214, 247 (Bankr. E.D. Mich. 1996) (quotation omitted).

Here, Chartis acknowledged its awareness of Charbonneau's option exercise prior to the Chartis-Batoff Settlement based on its awareness of the First Federal Action, which includes as an exhibit Charbonneau's August 7, 2012 letter exercising the option. A1783-1787. Therefore, Chartis knew that at a minimum Charbonneau had a colorable claim to the Chartis Policy proceeds. Indeed, anyone reading the allegations of the First Federal Action would immediately recognize Batoff's and Charbonneau's ongoing dispute over whether Charbonneau had become equitable owner of the Chartis Policy proceeds by exercising her option.

Even if Charbonneau did not directly contact Chartis (which she felt no need to do since she was repeatedly told C&C was representing her interests), Chartis's argument based on that does not hold water here—it knew she wanted to rebuild Bloomfield, had exercised her purchase option, and through the option would obtain the rights to the homeowners insurance claim. Moreover,

61

interpleader actions are appropriate even if the other party only "may claim" the

proceeds. 28 U.S.C. § 1335(a)(1).

The reason for Chartis's conduct, of course, is that settling with Batoff

capped Chartis's liability at $18.5 million. Had Chartis allowed Charbonneau to

state her case before a neutral tribunal, Chartis could have ended up liable for GRC

Coverage far in excess of $18.5 million. In other words, this is not just a situation

where two parties make competing claims to a fixed amount of money.

Charbonneau's claim could require Chartis to pay far more since she wished to

rebuild Bloomfield, and Batoff did not. O'Keefe's decision to settle without

informing Charbonneau potentially saved his company tens of millions of dollars.

The District Court never acknowledged Charbonneau's interpleader

argument.

2.    The Pennsylvania Unfair Insurance Practices Act (UIPA) Did
      Not Require Chartis to Secretly Settle with Batoff.

Chartis argued that it could have violated the UIPA and risked a bad

faith claim by Batoff if it did not grant Batoff the secret lump sum settlement. See

40 Pa. Stat. 1171.5(10)(vi) (insurer must "attempt[] in good faith to effectuate

prompt, fair and equitable settlements of claims…"). The District Court accepted

this argument as evidence Chartis did not violate "the rules of the game." A52-53

(¶ 76).

The District Court's holding puts the cart before the horse. There is no dispute that the UIPA obligates Chartis to reach "prompt" settlements. But the settlements must be "fair and equitable" too, and the benefit of that obligation flows to the rightful recipient of the insurance proceeds, whoever that might be. In this instance, Chartis knew that it was at best unclear who was entitled to the Chartis Policy proceeds. It is not relevant that Batoff (according to Chartis's version of the facts) pressured Chartis to settle. If Batoff was not the rightful owner of the policy proceeds, his settlement request is beside the point. Chartis did not meet its obligation to promptly settle by settling with the wrong person. If it did, then insurers could settle with whomever they wished and argue that doing otherwise would violate the UIPA.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Charbonneau respectfully submits that the rulings of the District Court should be reversed.  Charbonneau respectfully requests that this Court hear oral argument on this appeal.

Dated:  February 8, 2016          Respectfully submitted,

/s/ Darin J. McMullen, Esq.
ANDERSON KILL P.C.
Finley T. Harckham, Esq.
Darin J. McMullen, Esq. *(PA Bar DM1057)*
Nicholas R. Maxwell, Esq.
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
P: (267) 216-2700
F: (215) 568-4573

*Attorneys for Appellant Julie Charbonneau*

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

Pursuant to Local Appellate Rule 46.1, the undersigned hereby

certifies that the attorneys whose names appear on the Brief of Appellant Julie

Charbonneau are members in good standing of the Bar of the United States Court

of Appeals for the Third Circuit.

Dated:  February 8, 2016          Respectfully submitted,

/s/ Darin J. McMullen, Esq.
ANDERSON KILL P.C.
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
P: (267) 216-2700
F: (215) 568-4573

*Attorneys for Appellant Julie Charbonneau*

65

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,971 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: February 8, 2016                    Respectfully submitted,

/s/ Darin J. McMullen, Esq.
ANDERSON KILL P.C.
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
P: (267) 216-2700
F: (215) 568-4573

*Attorneys for Appellant Julie Charbonneau*

66

## VIRUS CERTIFICATION & IDENTICAL COMPLIANCE OF BRIEF

I, Nicholas R. Maxwell, hereby certify that:

The electronic version of this brief is identical to the text version in the paper copies filed with the court. This document was scanned using Norton Anti-virus (with updated virus definition file as of February 5, 2016) and no viruses were detected.

Dated: February 8, 2016

/s/ Nicholas R. Maxwell
Nicholas R. Maxwell

*Attorneys for Appellant Julie Charbonneau*

67

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served on all counsel of record the foregoing via the CM/ECF system for the United States Court of Appeals for the Third Circuit. I further certify that seven (7) hard copies of the foregoing were sent to the Clerk's Office via Federal Express Next Business Day Delivery.

Dated: February 8, 2016

/s/ Nicholas R. Maxwell
Nicholas R. Maxwell
*Attorneys for Appellant Julie Charbonneau*

68

**JOINT APPENDIX**
**VOLUME I OF IV**
**(Pages A1 to A55)**

# TABLE OF CONTENTS

PAGE

## Volume I of IV
### (Bound with Appellant's Brief)

Plaintiff's Notice of Appeal, dated October 20, 2015 . . . . . . . . . . . . . . . . . . . . . . A1

Order Appealed From, dated June 30, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3

Memorandum and Opinion by the Honorable William H. Yohn, Jr.,
    dated June 30, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4

Order Appealed From, dated September 21, 2015 . . . . . . . . . . . . . . . . . . . . . . A34

Findings of Fact and Conclusions of Law by the
    Honorable William H. Yohn, Jr., dated September 21, 2015 . . . . . . . . . A35

## Volume II of IV

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A56

Complaint, dated July 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A84

Defendant Chartis Property Casualty Co.'s Statement of Undisputed
    Material Facts in Support of Its Renewed Motion for Summary
    Judgment, dated April 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A114

    Exhibit A—
    Homeowners Declarations Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A132

    Exhibit B—
    Plaintiff's Response to Defendant's First Set of Requests for
    Admissions, dated May 27, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A167

ii

                                                                    PAGE

Exhibit C—
Lease Agreement between Jerald Batoff and Julie Charbonneau
with Respect to 200 S. Ithan Avenue, Villanova, Pennsylvania . . . . . A181

Exhibit D—
Excerpts of the Deposition Transcript of Julie Charbonneau,
dated October 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A203

Exhibit E—
Excerpts of the Deposition Transcript of Julie Charbonneau,
dated October 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A213

Exhibit F—
Release, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A223

Exhibit G—
Letter from Jerald Batoff to Julie Charbonneau,
dated July 25, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A230

Exhibit H—
Letter from Robert C. Heim to Jerald Batoff,
dated August 7, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A234

Exhibit I—
Excerpts of the Deposition Transcript of James O'Keefe,
dated September 16, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A240

Exhibit J—
Excerpts of the Deposition Transcript of Richard Cohen,
dated November 13, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A244

Exhibit K—
Email from Richard Cohen to James O'Keefe,
dated September 16, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A248

Exhibit L—
Verified and Amended Answer, Affirmative Defenses, and
Counterclaims of Defendants Julie Charbonneau and Dean
Topolinski, dated October 22, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . A258

Exhibit M—
Client Report, dated August 17, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . A300

iii

PAGE

Exhibit N—
Answer, Affirmative Defenses, and Counterclaims of Defendants
Julie Charbonneau and Dean Topolinski, dated October 1, 2012 . . . . A303

Exhibit O—
Excerpts of the Transcript of Hearing before the Honorable
William H. Yohn, Jr., dated March 20, 2013 . . . . . . . . . . . . . . . . . . . . . A335

Exhibit P—
Settlement Agreement and Mutual Release, dated April 5, 2013 . . . . A339

Exhibit Q—
Modified Stipulation, dated May 6, 2013 . . . . . . . . . . . . . . . . . . . . . . . . A349

Plaintiff Julie Charbonneau's Response and Counterstatement of
    Facts to Defendant Chartis Property Casualty Co.'s Statement
    of Undisputed Material Facts, dated May 20, 2015 . . . . . . . . . . . . . . . A359

Exhibits to Plaintiff's Memorandum of Law in Opposition to
    Defendant's Renewed Motion for Summary Judgment,
    dated May 20, 2015:

Exhibit A—
Excerpts of the Deposition Transcript of Damon Faunce,
dated October 14, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A387

Exhibit B—
Excerpts of the Deposition Transcript of James O'Keefe,
dated September 16, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A393

Exhibit C—
Excerpts of the Deposition Transcript of Richard Cohen,
dated November 13, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A407

Exhibit D—
Excerpts of the Transcript of Oral Argument before the
Honorable William H. Yohn, Jr., dated October 1, 2014 . . . . . . . . . . . A419

Exhibit E—
Excerpts of the Deposition Transcript of Julie Charbonneau,
dated October 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A425

iv

PAGE

Exhibit F—
Excerpts of the Deposition Transcript of Dean Topolinski,
dated November 4, 2014 .......................................... A429

Exhibit G—
Excerpts of the Deposition Transcript of Jerald S. Batoff,
dated May 13, 2015............................................... A433

Exhibit H—
Letter from Douglas R. Widin to Jim O'Keefe,
dated September 20, 2012 ......................................... A441

Exhibit I—
Email from Jerry Batoff to Dean Topolinski, Jerry Batoff
and Julie Charbonneau, dated April 9, 2012 ....................... A444

Affidavit of Russell Whitman, Esq., dated May 15, 2015 ............... A450

Affidavit of Julie Charbonneau, dated May 20, 2015 ................... A452

Defendants' Answer, Counterclaims and Affirmative Defenses,
*Batoff v. Charbonneau and Topolinski*, 12-cv-5397 ................ A455

Exhibit 1—
Lease Agreement between Jerald Batoff and Julie Charbonneau
with Respect to 200 S. Ithan Avenue, Villanova, Pennsylvania ..... A486

Exhibit 2—
Joinder, dated November 3, 2011 ................................. A516

Civil RICO Complaint, *Batoff v. Charbonneau and Topolinski*,
12-cv-6673, dated November 29, 2012 ............................ A519

**Volume III of IV**

Trial Transcript, dated August 5, 2015 ................................ A576

Trial Transcript, dated August 6, 2015 ................................ A683

v

PAGE

Trial Transcript, dated August 7, 2015 ................................ A792

Trial Transcript, dated August 10, 2015 ............................. A891

Trial Transcript, dated August 11, 2015 ............................. A958

Trial Transcript, dated August 12, 2015 ............................. A1073

Hearing Transcript, dated August 13, 2015 .......................... A1131

Deposition Transcript of Richard Cohen,
    dated November 13, 2014 ........................................ A1151

Deposition Transcript of Jerald S. Batoff,
    dated May 13, 2015 ............................................. A1292

## Volume IV of IV

## Plaintiff's Trial Exhibits

Exhibit 1—
Standard Agreement for the Sale of Real Estate .................. A1366

Exhibit 3—
Chartis Homeowners Policy ..................................... A1396

Exhibit 13—
Public Adjusters Contract, dated April 6, 2012 .................. A1430

Exhibit 14—
Email from Peter Piotrowski to William Bernecker and others,
dated April 6, 2012 ............................................. A1432

Exhibit 17—
Email from Julie Charbonneau to Jerry Batoff and others,
dated April 9, 2012 ............................................. A1434

Exhibit 25—
Email from James O'Keefe to Richard Cohen,
dated April 13, 2012 ............................................. A1436

vi

PAGE

Exhibit 26—
Contract 12–0411 - Batoff......................................... A1438

Exhibit 28—
Report to File(s), dated April 12, 2012........................... A1444

Exhibit 30—
Email from James O'Keefe to Richard Cohen,
dated April 19, 2012.............................................. A1450

Exhibit 31—
Email from Dawn Griffin to James O'Keefe,
dated April 20, 2012, with attachments including
November 3, 2011 Lease Option Agreement...................... A1486

Exhibit 39—
Email from Richard Cohen to James O'Keefe and others,
dated April 25, 2012.............................................. A1517

Exhibit 40—
Report to File(s), dated April 27, 2012........................... A1518

Exhibit 47—
Report to File(s), dated May 10, 2012............................ A1524

Exhibit 55—
Report to File(s), dated May 25, 2012............................ A1528

Exhibit 65—
Letter from Jerald Batoff to Julie Charbonneau,
dated July 25, 2012.............................................. A1532

Exhibit 66—
Email from Jerry Batoff to Richard Cohen,
dated July 25, 2012.............................................. A1536

Exhibit 67—
Email from Richard Cohen, dated July 26, 2012 .................. A1537

Exhibit 69—
Letter from Robert C. Heim to Jerald S. Batoff,
dated August 7, 2012 ............................................ A1538

vii

PAGE

Exhibit 71—
Letter from Douglas R. Widin to Michael S. Doluisio,
dated August 15, 2012 .......................................... A1543

Exhibit 72—
Report to File(s), dated August 21, 2012 ........................ A1545

Exhibit 75—
Email from James O'Keefe to Herbert Bailey and others,
dated August 24, 2012 .......................................... A1548

Exhibit 78—
Letter from Douglas R. Widin to Jim O'Keefe,
dated September 14, 2012 ....................................... A1551

Exhibit 79—
Email from Richard Cohen to James O'Keefe and others,
dated September 16, 2012 ....................................... A1553

Exhibit 80—
Email from Michael Doluisio to Douglas R. Widin,
dated September 18, 2012 ....................................... A1554

Exhibit 81—
Email from James O'Keefe to Richard Cohen,
dated September 18, 2012 ....................................... A1555

Exhibit 83—
Letter from Douglas R. Widin to Jim O'Keefe,
dated September 20, 2012 ....................................... A1557

Exhibit 85—
Email from Douglas R. Widin to Michael Doluisio,
dated September 24, 2012 ....................................... A1559

Exhibit 91—
Draft Chartis-Batoff Release .................................... A1561

Exhibit 92—
Chartis-Batoff Release, dated October 1, 2012 ................... A1565

viii

PAGE

Exhibit 93—
Letter from Jerald Batoff to Stephen Chawaga,
dated October 1, 2012........................................... A1571

Exhibit 95—
Email from Richard Cohen to Brian Speckhals,
dated October 4, 2012........................................... A1573

Exhibit 102—
Note re: Insured Counsel, dated October 18, 2012 ................ A1575

Exhibit 105—
Letter from Michael S. Doluisio to Clarke & Cohen, Inc.,
dated November 15, 2012 ........................................ A1576

Exhibit 111—
Report to File(s), dated December 4, 2012 ....................... A1578

Exhibit 114—
Excerpts of the Affidavit of Damon Faunce,
dated April 4, 2013 ............................................ A1579

Exhibit 115—
Settlement Agreement and Mutual Release,
dated April 5, 2013 ............................................ A1586

Exhibit 116—
Wakelee Client Report, dated May 3, 2013 ....................... A1595

Exhibit 118—
Sworn Statement in Proof of Loss for Julie Charbonneau and
Dean Topolinski, Policy PCG0004646619, dated June 4, 2013 .... A1599

Exhibit 123—
Amended Complaint, 13-cv-4323, dated October 20, 2014 ........ A1602

Exhibit 124—
Defendant Chartis Property Casualty Co.'s Answer to the
Amended Complaint, dated November 7, 2014 ................... A1632

ix

PAGE

Exhibit 130—
Chartis Private Client Group Best Practices Guide
Homeowners Property Claims Handling 2010 .................... A1665

Exhibit 133—
Photographs .................................................. A1713

Exhibit 145—
Excerpted Standard Form of Agreement between Charbonneau
and Doozer Construction, dated July 24, 2015 ................... A1717

Exhibit 179—
Complaint, *Batoff v. Charbonneau and Topolinski*, 12-cv-5397.... A1727

**Defendant's Trial Exhibits**

Exhibit 14—
Agreement of Sale, dated August 1, 2011 ........................ A1793

Exhibit 15—
Agreement Regarding Deposit, dated August 1, 2011 ............. A1795

Exhibit 16—
Residential Lease Agreement, dated August 1, 2011 ............. A1797

Exhibit 27—
Public Adjusters Contract, dated April 8, 2012 .................. A1801

Exhibit 43—
Client Report, dated August 17, 2012 ........................... A1802

Exhibit 97—
Report to File(s), dated July 17, 2012 ........................... A2156

Exhibit 118—
Note re: File Update, dated September 6, 2012 (Redacted) ........ A2166

**A1**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE CHARBONNEAU, | CIVIL ACTION |
| Plaintiff, | |
| v. | No.:  13-cv-4323-WY |
| CHARTIS PROPERTY CASUALTY CO. | |
| Defendant. | |

### <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiff Julie Charbonneau appeals to the United

States Court of Appeals for the Third Circuit from: (1) the July 1, 2015 Order granting in part

and denying in part the renewed Motion for Summary Judgment of Defendant Chartis Property

Casualty Co. (Docket No. 129), with incorporated Memorandum Opinion (Docket No. 128); and

(2) the September 21, 2015 Order entering judgment for Defendant Chartis Property Casualty

Co. (Docket No. 216), with incorporated Findings of Fact & Conclusions of Law (Docket No.

215).  Plaintiff appeals from all portions of the July 1, 2015 Order and incorporated

Memorandum Opinion other than the portion that denied Defendant summary judgment on

Plaintiff's cause of action for tortious interference with contract.

Dated:    October 20, 2015          Respectfully submitted,

ANDERSON KILL P.C.

By:  */S/ DARIN J. MCMULLEN* (DM1057**)**
    Finley T. Harckham, Esq. *(pro hac vice)*
    Darin J. McMullen, Esq.
    Nicholas R. Maxwell, Esq. *(pro hac vice)*
    1600 Market Street, Suite 2500
    Philadelphia, PA  19103
    Telephone:  267-216-2700

    *Attorneys for Plaintiff Julie Charbonneau*

**A2**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served on all counsel of record the foregoing via the

CM/ECF system.

Dated:    October 20, 2015

/S/ DARIN J. MCMULLEN (DM1057)

Darin J. McMullen

*Attorneys for Plaintiff Julie Charbonneau*

**A3**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| JULIE CHARBONNEAU, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 13-4323 |
| v. | : | |
| | : | |
| CHARTIS PROPERTY CASUALTY CO., | : | |
| | : | |
| Defendant. | : | |

## ORDER

**AND NOW** this 30th day of June, 2015, upon consideration of defendant Chartis

Property Casualty Company's renewed motion for summary judgment (Doc. No. 95), and

plaintiff's opposition thereto, **IT IS HEREBY ORDERED** that:

1. The motion is **GRANTED** and judgment is entered in favor of the defendant, Chartis
   Property Casualty Company, and against the plaintiff, Julie Charbonneau, on
   plaintiff's breach of contract, breach of the implied duty of good faith and fair
   dealing, bad faith in violation of 42 Pa. Cons. Stat. Ann. § 8371, and declaratory
   relief claims (Counts I, II, IV, and V);

2. The motion is **DENIED** as to Count III.


                                                    /s/  William H. Yohn Jr.
                                                    William H. Yohn Jr., Judge

**A4**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                              |   |              |
|------------------------------|---|--------------|
| JULIE CHARBONNEAU,           | : |              |
|                              | : | CIVIL ACTION |
| Plaintiff,                   | : |              |
|                              | : | NO. 13-4323  |
| v.                           | : |              |
|                              | : |              |
| CHARTIS PROPERTY CASUALTY CO., | : |            |
|                              | : |              |
| Defendant.                   | : |              |

### MEMORANDUM

YOHN, J.                                                    June 30, 2015

On April 4, 2012, plaintiff Julie Charbonneau was living as a tenant at Bloomfield, a historic home in Villanova, Pennsylvania, when a fire destroyed the property.  Charbonneau thereafter attempted to exercise an option under her lease to purchase Bloomfield from Jerald Batoff, the property's owner.  During roughly the same period of time, Batoff was involved in negotiations with the issuer of his homeowner's insurance policy, defendant Chartis Property Casualty Company, which ultimately agreed to pay him $18.5 million (plus additional payments already made) as a result of the fire.  Several rounds of litigation ensued between Batoff and Charbonneau, leading to a settlement agreement under which Charbonneau received $11 million of the $18.5 million and title to Bloomfield.  Charbonneau subsequently brought this action against Chartis, claiming that Chartis's dealings with Batoff were improper and that she has been wrongly denied millions of dollars in additional insurance proceeds owed to her to cover the cost of rebuilding Bloomfield.  Chartis has filed a motion for summary judgment, to which Charbonneau responded in opposition.  Because there is a genuine dispute of material fact with

respect to only plaintiff's claim for intentional interference with contractual relations, I will grant the motion as to her other claims.

## I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY

In December 2011, Batoff and Charbonneau executed a lease/option agreement ("LOA") for Bloomfield, a property located in Villanova, Pennsylvania.  Pl.'s Resp. & Counterstatement of Facts to Def.'s Statement of Undisputed Material Facts ("Resp.") at 5 ¶ 19; Def.'s Statement of Undisputed Material Facts ("SUMF") Ex. A at 2.  Under the LOA, Charbonneau had the option to purchase Bloomfield from Batoff during the lease period for $3.9 million.  Resp. 6 ¶ 21; SUMF Ex. C at § 5(a)(iii).  In the event that Bloomfield suffered a casualty during the lease period costing more than $1 million to repair, the LOA further provided that Charbonneau could likewise exercise her option, and that she would also be "entitled to receive at closing a credit in the amount of any insurance proceeds paid to [Batoff], and an assignment [of Batoff's] rights to receive any unpaid proceeds."  Resp. 6 ¶ 22; SUMF Ex. C at § 17.  Bloomfield was destroyed by fire on April 4, 2012.  Resp. 6 ¶ 23; SUMF 5 ¶ 23.

At the time of the fire, Batoff held a homeowner's insurance policy for Bloomfield issued by Chartis Property Casualty Company.  Resp. 3 ¶ 10; SUMF 3 ¶ 10.  The policy provided for two different types of payments in the event of a covered loss: "Replacement Cost" coverage or "Guaranteed Rebuilding Cost" coverage.  Resp. 4 ¶¶ 14-15; SUMF Ex. A at 31.  As defined by the policy, "Replacement Cost Coverage means that for a covered loss [Chartis] will pay the reconstruction cost of your house or other permanent structures, up to the coverage limit shown for that location on your Declarations Page, for each occurrence."  *Id.*  The declarations page of Batoff's policy specifies that the coverage limit for his dwelling is $22,373,762.  SUMF Ex. A at

2.[1]  The policy further provides that Chartis will pay this reconstruction cost "whether or not you will actually rebuild your house or other permanent structures." *Id.* at 31.  By contrast, the policy states that "Guaranteed Rebuilding Cost coverage means that for a covered loss we will pay the reconstruction cost of your house or other permanent structure, for each occurrence, even if this amount is greater than the amount of coverage shown on the Declarations Page." *Id.*  A payment of the Guaranteed Rebuilding Cost, however, requires that "you must repair or rebuild your home or other permanent structure at the same location." *Id.*  The policy also contains a non-assignment clause providing that "[n]o one covered under this policy may assign or turn over any right or interest in regard to the policy without [Chartis's] written consent," as well as a commencement of suit provision that states the policyholder "agree[s] to bring any action against [Chartis] within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined."  Resp. 4-5 ¶¶ 16-17; SUMF Ex. A at 18.

Both Batoff and Charbonneau retained the public adjusting firm Clarke & Cohen to assist with filing their respective insurance claims arising out of the fire.  Resp. 7 ¶ 24; SUMF 5 ¶ 24.  During this process, neither Batoff nor Charbonneau submitted a proof of loss to Chartis.  Resp. 7 ¶ 25; SUMF 5-6 ¶ 25.  On July 25, 2012, Batoff informed Charbonneau that he believed the option provision of the LOA was null and void and that Charbonneau was in breach of the LOA.  Resp. 8 ¶ 27; SUMF 6 ¶ 27.  By letter to Batoff on August 7, 2012, Charbonneau stated that she "hereby exercises the option" under the LOA.  The letter constitutes mostly a rebuttal to Batoff's claim that the purchase option was null and void or never existed.  Significantly, it contains

---

[1] Charbonneau denies Batoff's statement to this effect on the basis that "there is no coverage called 'dwelling coverage' referenced on the Declarations Page of the Homeowner's Policy," and because the policy "provides unlimited 'Guaranteed Rebuilding Cost' if certain conditions are met, above and beyond the $22,372,262 figure." Resp. 4 ¶ 13.  This is a distinction without a difference: the parties agree that in the event of a covered loss to Bloomfield, the Chartis policy provided either a payment of up to $22,372,262 (the "Replacement Cost") for damage to the dwelling with no rebuilding requirement, or an uncapped payment (the "Guaranteed Rebuilding Cost") that requires rebuilding of the house at the same location.  *See* Resp. 4 ¶¶ 13-15; SUMF 3 ¶¶ 13-15.

absolutely no reference to an assignment of the insurance proceeds.  Resp. 8 ¶ 28; SUMF Ex. H.

On August 15, 2012, Batoff sued Charbonneau in the Delaware County Court of Common Pleas,

and the case was subsequently removed to this district.  Resp. 9-10 ¶ 32; SUMF 7 ¶ 32; *see also

Batoff v. Charbonneau* (*Batoff I*), No. 12-cv-5397-WY (E.D. Pa. Sept. 21, 2012).  Shortly

thereafter, Batoff filed a second suit against Charbonneau and her co-tenant at Bloomfield, Dean

Topolinski.  Resp. 9-10 ¶ 32; SUMF 7 ¶ 32; *see also Batoff v. Topolinski* (*Batoff II*), No. 12-cv-

6673-WY (E.D. Pa. Nov. 29, 2012).

On September 16, 2012, Richard Cohen of Clarke & Cohen sent a letter to Chartis on

behalf of Batoff, stating in part:

> I think it is important to remind you that we are quickly coming to the end of the
> window Mr. Batoff has allowed me to continue discussing a negotiated deal.  If
> we are not able to come to an agreed figure by the end of the week, I am being
> directed to proceed with submitting our claim.
>
> As I told you when we spoke on Monday of last week, I had no room to negotiate
> from the figure I expressed would get this done.  Frankly I am a little surprised by
> your most recent offer based on the potential exposure to Chartis if we do not get
> a deal done.  The figure I gave you is a significant savings to Chartis and I think
> we both agree we will get to the total policy limits as well as far into the
> guaranteed replacement cost provision the longer this continues.

Resp. 10-11 ¶ 35; SUMF Ex. K.  On October 1, 2012, Chartis and Batoff reached a settlement of

Batoff's insurance claim, under which Chartis agreed to pay Batoff an additional $18.5 million.

Resp. 12-13 ¶ 40; SUMF 9 ¶ 40.  Batoff also released Chartis from any further "claims,

demands, damages, actions or other form of proceedings of any kind whatsoever" arising out of

the fire, released Chartis from any claims of bad faith under 42 Pa. Cons. Stat. Ann. § 8371, and

agreed to indemnify Chartis against any future claims arising out of Batoff's policy, specifically

including claims made by Charbonneau or Topolinski.  Resp. 13-14 ¶¶ 42-43; SUMF Ex. F.

On October 1, 2012, Charbonneau filed counterclaims in *Batoff I*, seeking various forms of relief, including a declaration that "[a]t the closing, Defendants have the right to be assigned Mr. Batoff's rights to receive any insurance proceeds paid with respect to the Property post-closing . . . ."  Resp. 14-15 ¶ 46; SUMF 11 ¶ 46.  Charbonneau further requested specific performance such that "[a]t the closing, Jerald Batoff shall assign to Defendants the right to receive any insurance proceeds received post-closing . . . ."  Resp. 16-18 ¶ 47; SUMF 11 ¶ 47.  Charbonneau made essentially the same requests for relief in her amended counterclaims in *Batoff I*, filed on October 22, 2012.  Resp. 18-21 ¶¶ 48-50; SUMF 11-12 ¶¶ 48-50.

On April 5, 2013, Charbonneau entered into a settlement agreement and mutual release with Batoff, under which Batoff agreed to disburse to Charbonneau $11 million in insurance proceeds that Chartis had previously paid to him.  Resp. 23-24 ¶¶ 54-55; SUMF Ex. P.  Moreover, Batoff agreed to convey title of Bloomfield to Charbonneau within ten days of the court's approval of the settlement.  Resp. 24 ¶ 56; SUMF 13-14 ¶ 56.  Batoff and Charbonneau further agreed to a mutual release and discharge of "any and all claims, demands, causes of action, obligations, damages, and liabilities" against one another.  Resp. 24 ¶ 57; SUMF 14 ¶ 57.  By its terms, the settlement agreement was fully integrated.  Resp. 25 ¶ 59; SUMF 14-15 ¶ 59.  Title to Bloomfield transferred as agreed from Batoff to Charbonneau in May 2013 by way of a "modified stipulation" entered with the court, which did not include an assignment of any of Batoff's rights under his insurance policy.  Resp. 26 ¶¶ 61-62; SUMF Ex. Q.  Charbonneau admits that she never notified Chartis of an assignment from Batoff.  Resp. 26-27 ¶ 64; SUMF 15-16 ¶ 64.

Charbonneau filed this lawsuit against Chartis on July 25, 2013.  Chartis filed a motion to dismiss on September 20, 2013, which I denied on March 26, 2014.  *See* Doc. No. 15.  Chartis

moved for summary judgment on June 25, 2014, which I denied without opinion by order on

October 16, 2014.  *See* Doc. No. 49.  Charbonneau subsequently filed an amended complaint on

October 21, 2014.  Chartis then filed this renewed motion for summary judgment on April 15,

2015.  Charbonneau submitted a response in opposition on May 20, 2015, and Chartis replied on

May 27, 2015.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "Material facts are those that could affect the outcome of the proceeding, and a

dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to

return a verdict for the nonmoving party."  *Roth v. Norfalco, LLC*, 651 F.3d 367, 373 (3d Cir.

2011) (citations and internal quotation marks omitted).  To establish the existence or absence of a

genuine dispute as to any material fact, a party must "cit[e] to particular parts of materials in the

record" or "show[] that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.

R. Civ. P. 56(c)(1)(A)-(B).  "In evaluating the motion, 'the court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence.'"  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d

Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## III.    DISCUSSION

Chartis has moved for summary judgment on every claim in Charbonneau's amended complaint: breach of contract (Count I), breach of the implied duty of good faith and fair dealing (Count II), intentional interference with contractual relations (Count III),[2] bad faith in violation of 42 Pa. Cons. Stat. Ann. § 8371 (Count IV), and a request for declaratory relief (Count V).

As a threshold matter, Charbonneau asserts that the court should decline to consider or otherwise deem waived many of Chartis's arguments.  First, Charbonneau claims that where Chartis raises arguments that it previously made in its earlier motion for summary judgment, the court has "discretion not to consider facts" in support of those arguments that were available to Chartis at the time but not relied on in that motion.  Opp. 8.  Second, Charbonneau contends that where Chartis raises for the first time here arguments that rely solely on facts that were available as of the prior motion, those arguments are waived "as a matter of Pennsylvania law."  *Id.* at 9.

These claims fail for several reasons.  Most importantly, the cases that Charbonneau cites do not support the conclusions that she reaches.  On the discretion point, Charbonneau relies entirely on *Krueger Associates v. American District Telegraph Company of Pennsylvania*, 247 F.3d 61 (3d Cir. 2001), in which the district court denied defendant's initial motion for summary judgment to allow for discovery, then granted its renewed motion.  The Third Circuit affirmed:

> [N]othing prohibited the district court from ruling on [defendant's] renewed motion for summary judgment.  Under the law of the case doctrine the district court's denial of [defendant's] initial summary judgment motion did not create any bar to the court's later reconsideration of the renewed motion.  After having turned down [defendant's] first try without opinion in an apparent effort to allow [plaintiff] to conduct discovery, the district court surely acted within its discretion in reconsidering the motion post-discovery.

*Id.* at 65-66 (citations omitted).  The fact that I denied Chartis's initial motion for summary judgment without opinion, which was filed before either party could take discovery, therefore,

---

[2] I will address this claim last, because the others are all closely related.

poses no bar to my considering Chartis's renewed motion for summary judgment now that the

evidentiary record has had time to develop.  Moreover, even if *Krueger Associates* can be read as

authorizing the court not to consider some of Chartis's arguments, the stated rationale for doing

so is self-defeating.  Charbonneau contends that "the parties could have saved nearly a year of

costly additional litigation" if, in its prior motion, Chartis had pointed to facts known at the time

that it now says are dispositive.  Opp. 8.  But this claim, which is essentially an appeal to judicial

economy, cuts against Charbonneau's position.  It does not conserve judicial resources (nor does

it comply with Rule 56) to deny the motion on this basis and then to have a jury serve as

factfinder where there is no genuine dispute of material fact based on the fully developed record.

Thus, for these reasons and to the extent it is a matter of discretion, I choose to hear Chartis's

arguments.

On the waiver point, Charbonneau likewise cites only one decision that is binding on this

court: *Allegheny International v. Allegheny Ludlum Steel Corporation*, 40 F.3d 1416 (3d Cir.

1994).  There, the Third Circuit affirmed a denial of defendant's second motion for summary

judgment, finding that its belatedly-raised argument had been waived.  *Id.* at 1431.  But that

decision turned on the fact that the argument at issue concerned standing, as those particular

arguments "'should be [raised] with reasonable promptness.'"  *Id.* (quoting 6A Charles A.

Wright, et al., *Federal Practice and Procedure* § 1554, at 407 (1990)).  The Third Circuit did not

lay down a general waiver rule of the kind that Charbonneau suggests.  By the same token, every

other case cited by Charbonneau on the topic of waiver—none of which controls here, in any

event—is inapposite in some way.[3]  I will therefore fully consider all of Chartis's arguments.[4]

---

[3] *Noble Biomaterials v. Argentum Medical, LLC,* No. 3:08-CV-1305, 2011 WL 4458796 (M.D. Pa. Sept. 23, 2011),
concerned a renewed motion for judgment as a matter of law under Rule 50, not a renewed motion for summary
judgment under Rule 56.  *United States v. National Railroad Passenger Corporation*, No. CIV.A. 86-1094, 2004
WL 1335250 (E.D. Pa. June 15, 2004), and *Household Financial Services v. Mortgage Group*, No. 01 C 5567, 2004

### A.    Breach of Contract

Under Pennsylvania law, breach of contract claims must contain three elements: "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"   *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Charbonneau contends that a contract formed between herself and Chartis when she received her assignment from Batoff.  Amend. Compl. ¶¶ 77-78.  She argues that Chartis breached both "by expressly refusing in advance to pay [her] anything" and by failing to secure her "prior approval" before entering its settlement with Batoff.  Opp. 23, 19.  And she claims that she suffered damages "consisting of unpaid insurance proceeds" and "the reduced amount of insurance proceeds received in her settlement with Batoff."  Amend. Compl. ¶¶ 83-84.  Chartis offers numerous arguments in response, which I will address in turn.

### 1.    The non-assignment clause

First, Chartis asserts that no contractual relationship ever formed between itself and Charbonneau, as Charbonneau "could not have been assigned the Homeowner's Policy itself because the Policy included a non-assignment clause."  Def.'s Mem. Law Supp. Renewed Mot.

---

WL 2457781 (N.D. Ill. Oct. 29, 2004), both dealt with affirmative defenses that, under Rule 8, should have been raised in responsive pleadings or by motion.  *Sunlight Electrical Contracting Company v. Turchi*, No. CIV.A. 08-5834, 2011 WL 4086077 (E.D. Pa. Sept. 13, 2011), likewise discussed waiver under Rule 8, as well as the principle that a reply brief "is not intended as a forum to raise new issues."  *Id.* at *15 (quoting *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006)).  *Bakalis v. Golembeski*, 125 F.3d 576 (7th Cir. 1997), and *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664 (1st Cir. 1996), both addressed waiver of a qualified immunity defense, which must be raised expeditiously.  In *Council on American-Islamic Relations Action Network v. Gaubatz*, No. CV 09-2030 (CKK), 2015 WL 1021280 (D.D.C. Mar. 6, 2015), the court deemed as waived an argument that plaintiff raised for the first time in its opposition to a renewed motion for summary judgment, the plaintiff having not complied with the court's instructions to present that argument in an earlier filing.

[4] The court rejects Charbonneau's repeated arguments that the issues raised now were raised or should have been raised in Chartis's first motion for summary judgment.  That motion consisted primarily of a rehash of the arguments raised in the motion to dismiss, which had been fully analyzed in the court's memorandum accompanying its order disposing of the motion to dismiss.  At the time the first motion for summary judgment was filed, very little or no discovery had been taken, and the court declined to re-analyze the issues covered in the motion to dismiss.  It simply denied the motion for summary judgment in a one page order with minimal comments.

Summ. J. ("Def.'s Mem.") at 7.  As Charbonneau notes, however, the Pennsylvania Supreme

Court has set out the "general rule" that "a non-assignment clause in an insurance contract is not

enforceable after the loss has occurred."  *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1224 (Pa. 2006).

Neither party disputes that, if an assignment occurred here, it took place sometime after the fire

at Bloomfield.  Chartis argues, however, that the general rule does not apply in this case, because

"[t]he reasoning articulated by Pennsylvania courts . . . is that, following a loss, the amount of

the claim is generally fixed and there is no increase in risk in assigning the right to payment of a

set amount," whereas here "the insurer's risk remains in question as the insured decides whether

to take a lump sum payment within policy limits, or take advantage of the guaranteed rebuilding

cost, which may or may not fall within policy limits."  Def.'s Mem. 15-16.  But *Egger* neatly

rejects such an argument, explaining that it "confuses loss with the subsequent fixing of a precise

amount of damages for that loss."  *Egger*, 903 A.2d at 1227.  Thus, the non-assignment clause in

the homeowner's policy does not bar Charbonneau's breach of contract claim.

        2.      *The Charbonneau/Batoff settlement*

        Second, Chartis contends that no contractual relationship formed between itself and

Charbonneau, because Charbonneau's settlement with Batoff did not include an assignment of

any rights against Chartis.  Chartis reasons that the Charbonneau/Batoff settlement was "'fully

integrated' to the exclusion of all other agreements and understandings," and so "the legal rights

exchanged between Charbonneau and Batoff during the 'closing' on the transfer of Bloomfield

were not governed by the terms of the disputed [LOA], but by the terms of their integrated

settlement agreement."  Def.'s Mem. 13-14 (internal quotation marks omitted).  Charbonneau

responds that her settlement "specifically addresses Chartis in one context but is silent about

whether [she] relinquished her right to an assignment of the Chartis policy proceeds," and that

this omission "establishes that the parties recognized Chartis's role and further shows the parties expressly chose *not* to have the settlement affect [her] assignment rights." Opp. 19. Moreover, Charbonneau argues that the settlement only resolved claims between herself and Batoff; her claim for unpaid proceeds—against Chartis—was therefore unaffected. *Id.* at 20. The Third Circuit has held that "[u]nder Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Allegheny*, 40 F.3d at 1424 (citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980)). The court further explained that "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)). Here, the language of the settlement agreement does not unambiguously support either party's position. A genuine dispute of fact therefore exists as to whether Charbonneau's settlement with Batoff foreclosed her right to subsequently seek unpaid insurance proceeds from Chartis.

> 3.  *The Guaranteed Rebuilding Cost requirements*

Third, Chartis claims that even if Charbonneau is entitled to an assignment of "unpaid proceeds," that term by definition cannot encompass Bloomfield's Guaranteed Rebuilding Cost. According to Chartis, "the Guaranteed Rebuilding Cost Coverage does not provide for fixed proceeds, but rather payment of an amount equal to rebuilding costs *if* the insured rebuilds." Def.'s Mem. 15. Therefore, the Guaranteed Rebuilding Cost is "not even available to an insured of Chartis' . . . until the insured is engaged in rebuilding the damaged property and incurs the claimed costs." *Id.* Looking to the text of the policy itself, the relevant provision states:

> Guaranteed Rebuilding Cost coverage means that for a covered loss we will pay the reconstruction cost of your house or other permanent structure, for each occurrence, even if this amount is greater than the amount of coverage shown on the Declarations Page. However, you must repair or rebuild your house or other

11

permanent structure at the same location.  If not, the maximum payable is the coverage limit shown for that location on the Declarations Page.

SUMF Ex. A at 31.  Chartis thus views the second sentence above as a precondition: under its reading, the policyholder must rebuild the damaged dwelling before seeking reimbursement in the amount of the Guaranteed Rebuilding Cost.  Charbonneau disagrees, arguing that "[t]he intent of the provision is clear: rebuilding must occur at the same physical location.  It is not intended to dictate that the policyholder (or his assignee) must front all rebuilding costs before requesting reimbursement from Chartis."  Opp. 22.  Once again, the text of the policy does not unambiguously support either party's interpretation, so there is a genuine dispute of fact as to whether Charbonneau can collect the Guaranteed Rebuilding Cost before rebuilding Bloomfield.

### 4.    *The commencement of suit and proof of loss provisions*

Fourth, Chartis maintains that Charbonneau is barred from bringing this claim—as well as the others—because she neither filed suit within a year of the fire nor submitted proof of loss.  The policy provides that "[i]n the event of an occurrence which is likely to involve this policy . . . you or an insured person must . . . [s]end to us within sixty (60) days of our request, your signed sworn proof of loss . . . ."  SUMF Ex. A at 17-18.  The policy also states, "You agree to bring any action against [Chartis] within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined."  *Id.* at 18.  It is undisputed that the fire at Bloomfield occurred on April 4, 2012, *see* Resp. 6 ¶ 23; SUMF 5 ¶ 23, and that this action was filed—more than one year later—on July 25, 2013, *see* Doc. No. 1.  It is further undisputed that Charbonneau has not submitted a proof of loss.  Resp. 7 ¶ 25; SUMF 5-6 ¶ 25.[5]  There is also no evidence that Chartis ever "requested" a proof of loss from

---

[5] In its statement of undisputed material fact, Chartis asserts that "Charbonneau did not submit a proof of loss to Chartis under the Homeowner's Policy" and cites Charbonneau's deposition for an admission to that effect.  *See* SUMF 5-6 ¶ 25.  Charbonneau does not deny that she declined to submit a proof of loss; rather, she denies that she

Charbonneau, or that 30 days have elapsed since "proof of loss has been filed and the amount of loss has been determined."

Chartis argues that Charbonneau's missing the one-year deadline "is alone sufficient to justify summary judgment in [its] favor," and it cites only one case for support: *Stone v. Franklin Homeowners Assurance*, in which the court did find that plaintiff's failure to timely file a proof of loss warranted entry of judgment for defendant. No. 1:13-CV-32, 2014 WL 2860830, at *3 (M.D. Pa. June 23, 2014). But that holding turned on the fact that the policy in question was administered under the federal government's flood insurance program: the Third Circuit has explained that, because this program draws on "the United States Treasury, strict adherence to the conditions precedent to payment is required." *Suopys v. Omaha Prop. & Cas.*, 404 F.3d 805, 809 (3d Cir. 2005). Moreover, "[f]ederal common law governs the interpretation" of these policies, and "general doctrines of waiver and estoppel do not apply" in most such cases. *Id.* Here, no federal financial interests are so implicated, and the insurance policy at issue is interpreted under Pennsylvania law. This is a crucial distinction, because the Pennsylvania Supreme Court has held that "if conduct or action on the part of the insurer is responsible for the insured's failure to comply in time with [a commencement of suit provision], injustice is avoided and adequate relief assured by resort to traditional principles of waiver and estoppel." *Gen. State Auth. v. Planet Ins. Co.*, 346 A.2d 265, 268 (Pa. 1975). Charbonneau has pointed to evidence that Chartis intentionally kept its dealings with Batoff unknown to her, and that this secrecy explains the delay in filing suit. *See* Resp. 10 ¶ 34, 11 ¶ 37, 12 ¶ 39. Therefore, a genuine dispute of fact exists as to whether conduct on the part of Chartis is responsible for

---

"had any obligation to submit a proof of loss" or that "Chartis would ever have accepted a proof of loss on [her] behalf anyway." Resp. 7 ¶ 25. Charbonneau has therefore tacitly admitted that she did not file a proof of loss.

Charbonneau's failure to file this lawsuit within the one-year period, and as a result it cannot be determined yet whether Chartis has waived the policy's commencement of suit provision.

Chartis similarly errs in arguing that Charbonneau's claims are barred because she failed to submit a proof of loss. The Pennsylvania Supreme Court has long and consistently held that an insurer can waive a proof of loss requirement. In *Cara v. Newark Fire Insurance Company*, 167 A. 356 (Pa. 1933), for instance, the court held that where an insurer received "prompt notice" of a fire and "made no demand for formal proofs of loss," the policy's proof of loss requirement was waived. *Id.* at 357. Moreover, in *City of Pittsburgh v. Firemen's Insurance Company of Newark*, 76 A.2d 368 (Pa. 1950), the court stated that "waiver of proofs of loss required by an insurance policy need not be express but may be inferred from any act of the insurer evincing a recognition of liability." *Id.* at 370 (internal quotation marks omitted); *see also id.* at 370 n.2 (collecting cases). The Third Circuit has further instructed that "[w]hether or not the insurer by its conduct has waived the filing of the proof of loss or the final statement of claim in any case is a question of fact to be determined by the jury." *Am. Credit Indem. Co. of New York v. W. K. Mitchell & Co.*, 78 F.2d 276, 278 (3d Cir. 1935). Here, Charbonneau has pointed to evidence of Chartis's conduct suggesting that it waived the proof of loss requirement, most notably that "Chartis allowed Batoff not to submit a proof of loss, at his request." Resp. 7 ¶ 25 (citing Opp. Ex. C at 234-35). A genuine dispute of fact therefore exists as to whether Chartis waived its proof of loss requirement, and so at this stage it cannot be determined whether Charbonneau's claims are barred by her failure to file a proof of loss.

> ### 5.    *The timing of the assignment*

Fifth, and finally, Chartis argues that even if Batoff did make a valid assignment to Charbonneau, that assignment must have taken place when Batoff and Charbonneau closed on

Bloomfield, by which point Batoff essentially had nothing left to assign.  To evaluate this claim, I look first to the terms of the LOA, under which the assignment arose.  It provides that, in the event of a casualty to Bloomfield:

> If the cost to repair any damage is more than $1,000,000, Tenant may elect to exercise its Option, and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to Landlord, and an assignment [of] all of Landlord's rights to receive any unpaid proceeds.

SUMF Ex. C at 8.  In the context of real estate, closing is "the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred." *Black's Law Dictionary* (10th ed. 2014).  The parties do not dispute that title to Bloomfield transferred from Batoff to Charbonneau pursuant to a modified stipulation filed by both parties in *Batoff I* and entered as an order of the court on May 6, 2013.  Resp. 26 ¶¶ 61-62; SUMF Ex. Q.  Consequently, there can be no dispute that closing on Bloomfield took place—at the earliest—on May 6, 2013.  A plain reading of the LOA requires me to conclude that as a matter of law Charbonneau could not have received "an assignment [of] all of [Batoff]'s rights to receive any unpaid proceeds" any earlier than May 6, 2013.[6]

Charbonneau disagrees.  First, relying on *Shaffer v. Flick*, 520 A.2d 50 (Pa. Super. Ct. 1987), Charbonneau argues that as a matter of Pennsylvania law, she "earned an assignment of the policy proceeds" when she "affirmatively exercis[ed] her option" on August 7, 2012—or, at the latest, when "closing should have occurred on September 7, 2012, the date [she] proposed when she exercised the option." Opp. 13, 11.  Second, pointing to an affidavit of "the attorney that drafted the Assignment Clause on [her] behalf," Charbonneau argues that the assignment clause was "intended" to mean that she "would be entitled to receive a memorialization of her assignment of insurance proceeds at closing, to present to the appropriate insurance company."

---

[6] In her deposition, Charbonneau conceded that she did not even request an assignment at closing.  *See* Charbonneau Dep. 307:9-308:15, Oct. 28, 2014 (SUMF Ex. E at 8-9).

Opp. 15; Whitman Aff. (Doc. No. 117) at ¶ 5. Third, citing no authority, Charbonneau argues that Chartis's interpretation of the assignment clause is "strained" because it gives Batoff "exclusive control over when the closing happened, including the ability to settle with Chartis and sign away [Charbonneau]'s rights to the Chartis policy proceeds before closing." Opp. 16.

These claims do not bear scrutiny. On the first point, *Shaffer* did hold that although tenants had not exercised their option to purchase property until after that property was destroyed by fire, "it [was] necessary to relate the transfer of equitable title back to the date of the option contract in order to do equity between the parties," and therefore the tenants "were "entitled to have the proceeds of the insurance policy applied against the purchase price of the farm." *Shaffer*, 520 A.2d at 51-52. But the court noted that this relation-back would not be warranted if "the parties [had] provided otherwise in their agreement." *Id.* at 52. Here, the parties expressly agreed that an assignment of unpaid insurance proceeds would occur "at closing" on Bloomfield. SUMF Ex. C at 8. *Shaffer* is therefore inapposite. On the second point, claims about what the drafter may have intended in writing the assignment clause are similarly misplaced, because Pennsylvania law "presum[es] that the writing conveys the parties' intent." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995).[7] On the third point, Chartis's interpretation does not give Batoff "exclusive control over when the closing happened," because the LOA provides that once Batoff receives notice that Charbonneau has exercised her option, he "shall notify [her] as to the date of closing; which shall not be earlier than 30 days or later than 60 days after [his] receipt" of such notice. SUMF Ex. C at 3 ¶ 5(a)(ii). It is axiomatic that when a seller breaches an agreement on the sale of real estate, the buyer "may go into a court of equity

---

[7] I note that Charbonneau quotes the exact same portion of *Duquesne Light* in the related litigation between herself and Batoff, also before this court, in which she contends that a disputed contractual phrase is unambiguous. *See* Defs.' Reply Mem. Law Supp. Mot. Dismiss Pl.'s Amend. Compl. at 4, *Batoff v. Charbonneau*, No. 2:14-cv-6879-WY (E.D. Pa. Feb. 17, 2015), ECF No. 31.

seeking to enforce the contract and to compel specific performance." *Payne v. Clark*, 187 A.2d 769, 770-71 (Pa. 1963). Indeed, Charbonneau sought specific performance on precisely this basis in her counterclaims in *Batoff I*. *See* SUMF Ex. N at 30-32. Thus, even under Chartis's interpretation, Charbonneau was not required simply to "wait around until Batoff, at his discretion, decided to allow a closing." Opp. 15.[8]

Even if any of Charbonneau's arguments were sound, however, "[u]nder Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Allegheny*, 40 F.3d at 1424 (citing *Mellon Bank*, 619 F.2d at 1011 n.10). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* (quoting *Hutchison*, 519 A.2d at 390). Here, "at closing" can be understood in only one way: the point at which title to Bloomfield traded hands. Charbonneau's arguments cannot transform an unambiguous term into an ambiguous one, so none of her arguments avoid the conclusion that—as a matter of law—the assignment from Batoff to Charbonneau could not have occurred before May 6, 2013.

Charbonneau admits that on October 1, 2012, "Batoff and Chartis reached a settlement for $18,500,000." Resp. 13 ¶ 40. The settlement provided that this payment (and others not at issue here) "shall constitute full satisfaction of all Claims by Batoff that have been, are or may be made under the Policy for damage to [Bloomfield] related to or arising in any way out of the

---

[8] Moreover, to the extent that Charbonneau views Chartis's interpretation as somehow unfair, Charbonneau responds succinctly to such an argument in her ongoing litigation with Batoff:

> "[T]he fact that parties do not agree on the proper construction of a contract does not render it ambiguous." *Paragon Tax Grp., LLC v. Broadview Networks Holdings Inc.*, No. CIV.A. 11-1699, 2012 WL 177410, at *6 (E.D. Pa. Jan. 20, 2012), *aff'd*, 503 F. App'x 161 (3d Cir. 2012). This is so even if a contract "may work a hardship or later seem unfair to one of the parties." *Little v. USSC Group, Inc.*, 404 F. Supp. 2d 849, 855 (E.D. Pa. 2005). Indeed, even if "the terms are harsh and unfair to the plaintiff, he voluntarily entered into the contract and must abide by its provisions." *Dodson v. New York Life Ins. Co.*, 36 Pa. Super. 551, 556 (1908).

Defs.' Reply Mem. Law Supp. Mot. Dismiss Pl.'s Amend. Compl. at 4, *Batoff v. Charbonneau*, No. 2:14-cv-6879-WY (E.D. Pa. Feb. 17, 2015), ECF No. 31.

Fire." SUMF Ex. F at 3 ¶ 1. It further declared that Batoff "release[d] and forever discharge[d] Chartis . . . from any and all claims, demands, damages, actions or other form of proceedings of any kind whatsoever, whether arising in contract, tort, or otherwise, that Batoff has, had, may have had, or may have against Chartis related to or arising in any way out of . . . any property damage to [Bloomfield] caused by, related to or arising in any way out of the Fire . . . ." *Id.* ¶ 2; *see also* Resp. 13-14 ¶¶ 42-43 (admitting the accuracy of these quotations). In sum, on October 1, 2012, Batoff received $18.5 million in full satisfaction of any claims made pursuant to his homeowner's policy as a result of the fire at Bloomfield, in exchange for which he released any contractual (or other) claims he may have had against Chartis arising out of the same event.

Even if there was an assignment on or after May 6, 2013, "An assignment is a transfer of property or a right from one person to another; unless qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." *Crawford Cent. Sch. Dist. v. Com.*, 888 A.2d 616, 619 (Pa. 2005). The Pennsylvania Supreme Court has further explained that "[u]nder the law of assignment, the assignee succeeds to no greater rights than those possessed by the assignor." *Id.* at 619-20. In short, "an assignee stands in the shoes of the assignor." *Id.* at 620. "Conversely, an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to all set-offs and counterclaims which would have been available against the assignor had there been no assignment, provided that these defenses and set-offs are based on facts existing at the time of the assignment." *Smith v. Cumberland Grp., Ltd.*, 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997). Here, Charbonneau is the assignee, Batoff the assignor, and Chartis the obligor. If there was an assignment, Charbonneau's rights against Chartis are therefore limited under Pennsylvania law to whatever rights Batoff may have had against Chartis at the time of the assignment.

As a result, Charbonneau cannot sustain a breach of contract claim against Chartis for two independently sufficient reasons. For one, prior to the time of assignment on or after May 6, 2013, Batoff released "any and all claims" he had or may have against Chartis as related to the fire at Bloomfield, including those "arising in contract." SUMF Ex. F at 3 ¶ 2. "In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language." *Taylor v. Solberg*, 778 A.2d 664, 667 (Pa. 2001). Here, the ordinary meaning of the release's language would have prevented Batoff from bringing a breach of contract claim against Chartis arising out of the Bloomfield fire at any point after October 1, 2012, when the release was signed. Thus, an assignment of rights from Batoff to Charbonneau on or after May 6, 2013 could not have included the right to sue Chartis for breach of contract.[9] Charbonneau herself admits as much, stating that after October 1, 2012, "Batoff had no rights left to assign because Chartis . . . demanded and received a full release of all future claims under the policy." Opp. 4. For another, Batoff accepted the $18.5 million payment from Chartis in "full satisfaction" of any claims he had for damage to Bloomfield arising out of the fire. SUMF Ex. F at 3 ¶ 1. In other words, in May 2013 even if Batoff had assigned to Charbonneau his "right[] to receive any unpaid proceeds" from Chartis in the event of damage to Bloomfield, in October 2012 Batoff had already agreed that he had received all of the proceeds that Chartis owed him for damage to Bloomfield. Even if the release does not prevent Charbonneau from bringing a breach of contract claim against Chartis, therefore, Charbonneau—standing in Batoff's shoes—cannot argue after the fact that Chartis failed to pay in full under the policy.

---

[9] Because I find that Batoff agreed to this release before the assignment could have taken place, I need not address Chartis's argument that, even if Charbonneau received an assignment of viable claims, Batoff was able to release those claims after the fact due to Charbonneau's failure to provide Chartis with notice of the assignment.

6.    *The prior written consent clause*

Charbonneau offers one last alternative theory, arguing that the LOA "required Chartis to

obtain [her] prior written consent before settling Batoff's claim, regardless of the option and any

assignment of policy proceeds," and further that "Chartis failed to meet this requirement, alone

establishing [her] breach of contract claim."  Opp. 18-19.  As the LOA provides:

> If the cost to repair any damage is more than $1,000,000, Tenant may elect to exercise its Option, and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to Landlord, and an assignment [of] all of Landlord's rights to receive any unpaid proceeds.  Landlord may make proof of loss; provided, however, that any adjustment of a proof of loss shall require the prior written consent of Tenant, which shall not be unreasonably withheld or delayed.

SUMF Ex. C at 8.  Thus, Charbonneau did have some right to approve or deny an agreement

between Batoff and Chartis following the Bloomfield fire.  But this was a right that Charbonneau

held against Batoff alone, because it is undisputed that the LOA is a contract between Batoff and

Charbonneau.  *See* SUMF Ex. C at 2.[10]  "It is a well established principle of law that a contract

cannot legally bind persons not party thereto."  *Matter of Estate of Barilla*, 535 A.2d 125, 128

(Pa. Super. Ct. 1987).  As a result, "Under Pennsylvania law, generally a person not a party to

the contract cannot be liable for a breach."  *Hampton v. Holmesburg Prison Officials*, 546 F.2d

1077, 1082 n.4 (3d Cir. 1976).  Charbonneau therefore cannot salvage her breach of contract

claim against Chartis by asserting only that Chartis failed to secure her consent to its agreement

with Batoff.

In sum, even assuming that (1) an assignment was valid despite the non-assignment

clause in the homeowner's policy, (2) an assignment was valid despite not subsequently being

---

[10] There is no doubt that Charbonneau did settle all claims with Batoff concerning her right to consent to a settlement between Batoff and Chartis concerning the insurance proceeds.  Charbonneau's counterclaims in the prior federal litigation included numerous references to her right to give prior written consent to such a settlement, and the April 5, 2013 agreement resolved all of the prior federal litigation.  *See* SUMF Ex. P.

20

included in the "fully integrated" settlement between Batoff and Charbonneau, (3) Charbonneau

is not required to rebuild Bloomfield before seeking its Guaranteed Rebuilding Cost, (4)

Charbonneau is not barred from bringing this action even though she neither submitted a proof of

loss nor filed suit within one year of the fire, and (5) Charbonneau did not consent to Chartis's

agreement with Batoff, I must still find that there is no genuine dispute of material fact on the

breach of contract claim, because Batoff assigned his rights to Charbonneau—if at all—on or

after May 6, 2013, after he had already released any breach of contract claims that he may have

had against Chartis on October 1, 2012.  "Material facts are those that could affect the outcome

of the proceeding," *Roth*, 651 F.3d 373, and the outcome is clear: these facts are undisputed and

Charbonneau cannot prevail as a matter of law on her breach of contract claim.  I will therefore

enter judgment for Chartis on Count I.

> **B.**    **Breach of Implied Duty of Good Faith and Fair Dealing**

As I noted in a footnote to my order denying Chartis's first motion for summary

judgment, "Neither party . . . submitted any appellate authority from the Pennsylvania courts or

the Third Circuit as to whether the present state of Pennsylvania law allows a separate claim for

breach of an implied duty of good faith and fair dealing in connection with a breach of contract

claim."  *See* Order, Oct. 16, 2014 (Doc. No. 49) at 1 n.1.  The parties have not addressed the

issue since that time, either, but the caselaw itself is quite clear.  A party to an insurance contract

can bring a contract cause of action for breach of the implied duty of good faith and fair dealing.

*See Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151, 153 (Pa.

Super. Ct. 1989) (stating that duty of good faith "arises under the law of contracts, not under the

law of torts" and that this duty has "been imposed upon the relationship between insurer and

insured").  But this duty "does not allow for a cause of action separate and distinct from a breach

of contract claim." *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013).  Here, however, Charbonneau does exactly that, bringing a breach of implied duty of good faith claim (Count II) as a cause of action independent of her breach of contract claim (Count I).

Moreover, in examining the implied duty of good faith in Pennsylvania, the Third Circuit has held that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91-92 (3d Cir. 2000).  Here, the allegations of bad faith that Charbonneau uses to support her implied duty of good faith claim are identical to those with which she supports her § 8371 claim (Count IV), which is indeed an established cause of action.  As part of the implied duty of good faith claim, plaintiff alleges:

> 88.  Chartis was prohibited from favoring one client's interest to the proceeds to the detriment of another client's interest. Chartis was prohibited from favoring one claimant's interest to the proceeds to the detriment of another.  However, Chartis did exactly that in secretly negotiating the Chartis Settlement with Batoff.

> 89.  In negotiating and entering into the Chartis Settlement with Batoff without notice to Plaintiff, Chartis breached its obligation to treat the equitable owner of the Property and who had an interest in the Homeowner's Policy proceeds with the requisite good faith and fairness as required by law.

> 90.  Chartis also owed a duty of good faith and fair dealing to Plaintiff because she was a Chartis policyholder under the Contents Policies, and violated that duty in failing to inform her of the above-described conduct by Chartis which was contrary to her interests.

Amend. Compl. ¶¶ 88-90.  Likewise, as part of the statutory bad faith claim, plaintiff asserts:

> 105.    In violation of its duties to Plaintiff and in violation of Pennsylvania law, Chartis is liable under section 8371 by engaging in bad faith by:

> (a) Knowingly and intentionally failing to treat Ms. Charbonneau and her interests in the insurance proceeds fairly;

> (b) Knowingly and intentionally favoring any interest Mr. Batoff claimed in the insurance proceeds over and to the detriment of Ms. Charbonneau's interests in the same insurance proceeds;

> (c) Knowingly and intentionally failing to notify or otherwise disclose to Ms. Charbonneau the negotiation of the Chartis Settlement in order to avoid payment of the Guaranteed Rebuilding Cost;

*Id.* ¶ 105(a)-(c).  Because the allegations of implied bad faith duplicate the allegations for Charbonneau's claim for relief under the established cause of action created by § 8371, they cannot be brought as an independent cause of action as a matter of Pennsylvania law.  I will therefore enter judgment for Chartis on the implied duty of good faith claim (Count II).

### C.  Bad Faith in Violation of 42 Pa. Cons. Stat. Ann. § 8371

Pennsylvania's bad faith statute provides for particular remedies "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured."  42 Pa. Cons. Stat. Ann. § 8371.  There are two ways that a plaintiff can file suit under § 8371.  First, "in order to bring an action for bad faith against an insurer, one must qualify as an 'insured' as that term is defined in the policy."  *Seasor v. Liberty Mut. Ins. Co.*, 941 F. Supp. 488, 491 (E.D. Pa. 1996), *aff'd*, 116 F.3d 469 (3d Cir. 1997).  Second, "[u]nder Pennsylvania law an insured's claims against his insurer . . . under section 8371 . . . are assignable."  *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 239 (3d Cir. 2003); *accord Allstate Prop. & Cas. Ins. Co. v. Wolfe*, 105 A.3d 1181, 1188 (Pa. 2014).  Here, Charbonneau follows the second path, asserting that "[a]s Batoff's assignee, [she] has an interest in the proceeds of the Chartis policy and therefore can sue Chartis for refusing to pay her those proceeds."  Opp. 34.

On October 1, 2012, however, Batoff released Chartis "from any claims, demands, damages, actions, or other forms of proceedings of any kind whatsoever of or for bad faith, including but not limited to claims under 42 Pa.C.S.A. § 8371, arising in any way" out of the Bloomfield fire.  SUMF Ex. F at 3 ¶ 3.  Again, "an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to all set-offs and

23

counterclaims which would have been available against the assignor had there been no assignment, provided that these defenses and set-offs are based on facts existing at the time of the assignment." *Smith*, 687 A.2d at 1172.  Moreover, it is not a matter of genuine dispute that Batoff assigned his rights to Charbonneau, if at all, on or after May 6, 2013.  Even assuming, as before, that the assignment was valid and that Charbonneau is not otherwise barred from bringing this action, Charbonneau therefore cannot prevail on her statutory bad faith claim, because she stands in the shoes of Batoff, who could not bring such a claim himself after October 1, 2012.

Moreover, though § 8371 does not define the term "bad faith," the Third Circuit has "predicted that the Pennsylvania Supreme Court would follow the definition of bad faith, and test for liability, set out by the Pennsylvania Superior Court in *Terletsky v. Prudential Property & Casualty Insurance Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)."  *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, No. 12-4450, 2015 WL 3634779, at *9 (3d Cir. June 12, 2015) (citation omitted).  *Terletsky*, in turn, defined "bad faith" to mean:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

649 A.2d at 688 (quoting *Black's Law Dictionary* 139 (6th ed. 1990)).  Thus, "[t]o recover under section 8371, a plaintiff must show by clear and convincing evidence that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim."  *Wolfe*, 2015 WL 3634779, at *9.  Even if the § 8371 claim is considered a claim of Charbonneau's, not Batoff's, for all the reasons discussed above regarding the breach of contract claim, there is no genuine

dispute of material fact that Chartis's refusal to pay Charbonneau was neither frivolous nor unfounded. I will therefore enter judgment for Chartis on the § 8371 claim (Count IV).

### D.    Declaratory Relief

In her amended complaint, Charbonneau alleges that "[i]nsofar as Chartis has breached its obligation to pay the Guaranteed Rebuilding Cost, [she] is entitled to a declaration of the reasonableness of the Rebuilding Plan, supplemented as necessary to take into account post-fire damage, and her right to the full cost to rebuild Bloomfield." Amend. Compl. ¶ 118. Accordingly, Charbonneau seeks "a declaration" that "[t]he full cost of the Rebuilding Plan for Bloomfield . . . is covered by the Homeowner's Policy" and that "Chartis must pay the full amount of the Guaranteed Rebuilding Cost as proven at trial." *Id.* As I found above, however, Chartis did not breach any obligation that it had toward Charbonneau. *See* Part III.A *supra.* Charbonneau has thus shown no entitlement to declaratory relief, whether under state or federal law.[11] As a result, I will enter judgment for Chartis on the declaratory relief claim (Count V).

### E.    Intentional Interference with Contractual Relations

Finally, Charbonneau claims that Chartis intentionally interfered in her contractual relationship with Batoff by convincing Batoff to settle his insurance claim without securing her approval, as required under the LOA's "prior written consent" provision. *See* SUMF Ex. C at 8. Before analyzing this claim on the merits, however, I must briefly address Chartis's argument that it fails under Pennsylvania's "gist of the action" and economic loss doctrines. In Pennsylvania, the gist of the action doctrine is "employed to ensure that a party does not bring a

---

[11] Charbonneau argues that "[t]his Court can make such a declaration regardless of whether the Chartis policy has been breached." Opp. 24. However, "[i]n order to sustain an action under the [state] Declaratory Judgment Act, a plaintiff must allege an interest which is direct, substantial and immediate, and must demonstrate the existence of a real or actual controversy." *Com., Office of Governor v. Donahue,* 98 A.3d 1223, 1229 (Pa. 2014). Likewise, "The case or controversy requirement must be met regardless of the type of relief sought, including [federal] declaratory relief." *Armstrong World Indus., Inc. by Wolfson v. Adams,* 961 F.2d 405, 410 (3d Cir. 1992). Because there is no longer an "actual controversy" as to Chartis's obligations toward Charbonneau under the policy, Charbonneau cannot prevail as a matter of law on her request for declaratory relief.

tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). "[T]he mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract." *Id.* at 69.  Rather, under the gist of the action doctrine, "a purported tort claim [is] properly dismissed by a trial court [when] the true gist or gravamen of the claim [is] for breach of a contract which existed between the parties." *Id.* at 68.  Similarly, the economic loss doctrine assists in maintaining the distinction between tort and contract actions.  *See Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 335 (E.D. Pa. 2003) (citing *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989)).[12]  Under the economic loss doctrine, plaintiffs cannot recover "in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (quoting *Duquesne Light*, 66 F.3d at 618).  Neither doctrine applies here.  Charbonneau's breach of contract claim alleges that Chartis violated the homeowner's policy, to which Charbonneau was arguably a party after she was assigned certain rights; her intentional interference claim, by contrast, alleges that Chartis wrongly caused Batoff to breach the LOA, a contract to which Chartis was never a party.  As a result, these two claims cannot share the same gravamen, and consequently neither the gist of the action doctrine nor the economic loss doctrine bars the interference claim.

Turning to the merits, under Pennsylvania law, "[t]he elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective contractual relation between the

---

[12] "Although the Supreme Court of Pennsylvania has not ruled on the viability of the economic loss doctrine, an en banc panel of the Pennsylvania Superior Court adopted the doctrine . . . [i]n *REM Coal Co. v. Clark Equipment Co.*, 563 A.2d 128, 134 (Pa. Super. Ct. 1989)." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002).

complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Ira G. Steffy & Son, Inc. v. Citizens Bank of Penn.*, 7 A.3d 278, 288-89 (Pa. Super. Ct. 2010). Pennsylvania courts generally look to the Restatement (Second) of Torts § 767 for guidance on the third prong. *See Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997). That section provides:

> In determining whether an actor's conduct in intentionally interfering with an existing contract or a prospective contractual relation is improper or not, consideration is given to the following factors: (a) [t]he nature of the actor's conduct, (b) [t]he actor's motive, (c) [t]he interests of the other with which the actor's conduct interferes, (d) [t]he interests sought to be advanced by the actor, (e) [t]he proximity or remoteness of the actor's conduct to the interference, and (f) [t]he relations between the parties.

Restatement (Second) of Torts § 767 (1982). On the first prong, the existence of a contractual relationship between Charbonneau and Batoff—here, a third party—is not in dispute. And on the fourth prong, there is without question a genuine dispute of fact as to whether Charbonneau has suffered damages by not being allowed to object to the agreement between Batoff and Chartis. Thus, the intentional interference claim turns on the second and third prongs, which "are closely related." *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008).

On the question of Chartis's intent, Charbonneau points to evidence suggesting that Chartis specifically meant to harm her in negotiating with Batoff to settle his insurance claim without Charbonneau's involvement, because Chartis knew that Charbonneau, unlike Batoff, would attempt to recover the full Guaranteed Rebuilding Cost for Bloomfield. Charbonneau cites the deposition of Chartis claims handler James O'Keefe, who stated that "it was never a secret that . . . [Charbonneau] was purchasing this home . . . and she wanted to bring it back to its

27

historical grandeur." O'Keefe Dep. 148:15-19, Sept. 16, 2014 (Opp. Ex. B). Likewise, Richard

Cohen's letter to Chartis on behalf of Batoff suggests that Chartis knew it would be more likely

to pay the full Guaranteed Rebuilding Cost if it did not timely reach an agreement with Batoff.

Resp. 10-11 ¶ 35; SUMF Ex. K. Moreover, Cohen stated in his deposition that Chartis allowed

Batoff not to file a proof of loss, because Batoff knew that "he wasn't able to write a proof of

loss without [Charbonneau's] approval." Cohen Dep. 234:1-235:5, Nov. 13, 2014 (Opp. Ex. C).

Chartis responds that it "had a legitimate interest in fulfilling its contractual obligations to

Batoff," Def.'s Mem. 26, but the Pennsylvania Supreme Court "has acknowledged that in most

cases the defendant's intentional conduct is done 'at least in part for the purpose of protecting

some legitimate interest which conflicts with that of the plaintiff.'" *Phillips*, 959 A.2d at 430

(quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971)). Thus, drawing "[a]ll

inferences . . . in the light most favorable" to Charbonneau as required at this stage, *Am. Eagle

Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009), a reasonable jury could find

that Chartis intended to harm Charbonneau's contractual relationship with Batoff when it

negotiated with Batoff to settle his claim without Charbonneau's consent.

On the privilege or justification prong, Chartis argues that, because "[t]he only person

entitled to rights under the Homeowner's Policy was Batoff," it stands to reason that "Chartis

was privileged and justified in settling his claim under the Policy." Def.'s Mem. 26. Chartis is

correct that, as a long-settled matter of Pennsylvania law, it acted properly in dealing with Batoff

alone before he and Charbonneau closed on Bloomfield:

> On the execution of the contract of sale, the [buyer] became, in equity, the owner
> of the property—the [seller] holding it thereafter as his trustee, with a right to
> retain it until the purchase-money should be paid. . . . When, therefore, the
> [property] was burned, it was the [buyer]'s property that was destroyed; [seller]
> lost nothing; the [buyer] was still obliged to take the property and pay the
> purchase-money. The insurance company, however, became liable to pay for the

loss to the [seller], because . . . he, as respects third persons, not privy to the contract of sale, is still to be regarded as the owner of the property.

*Reed v. Lukens*, 44 Pa. 200, 202 (1863); *accord Mut. Ben. Ins. Co. v. Goschenhoppen Mut. Ins. Co.*, 572 A.2d 1275, 1277 (Pa. Super. Ct. 1990) ("If a seller has insurance on the property, the seller can collect the proceeds of the policy, but holds them in trust for the buyer, who is compelled to perform under the agreement of sale."). Indeed, in *State Mutual Fire Insurance Company v. Updegraff*, 9 Harris 513 (Pa. 1853), the Pennsylvania Supreme Court went so far as to say that in such a situation, the insurer has "no equitable right to intermeddle between the [seller] and the [buyer]. Under such circumstances they must be content to respond to the party with whom they made the contract of insurance." *Id.* at 521. Likewise, the Third Circuit has explained that it generally "accord[s] substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern." *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993). These factors all weigh in favor of finding that Chartis's conduct was privileged or otherwise justified.

On the other hand, Charbonneau argues that in negotiating its settlement with Batoff, Chartis acted improperly—and knew it. O'Keefe stated in his deposition that Chartis transferred the agreed-upon funds to Batoff quickly via wire payment, which they "don't do . . . every day." O'Keefe Dep. 203:17-20. Likewise, Chartis waived the requirement under its policy that Batoff file a proof of loss, specifically because Batoff would have needed to secure Charbonneau's consent to such a filing pursuant to the LOA. Cohen Dep. 234:1-235:5. Moreover, O'Keefe stated that in the negotiations with Batoff, Chartis's counsel "kept insisting on an indemnification from Mr. Batoff against any claims from Ms. Charbonneau" as part of their agreement. O'Keefe Dep. 210:10-15. Viewing all inferences in the light most favorable to Charbonneau, I conclude that this evidence could suggest that Chartis short-circuited its standard

procedures specifically to avoid the risk that it would have to deal with Charbonneau—who would seek the full Guaranteed Rebuilding Cost for Bloomfield—and that it sought indemnification from Batoff against Charbonneau in particular because it knew that its conduct could well give rise to litigation.  "Although this evaluation of interests is not always susceptible of 'precise definition,' it is clear that the central inquiry [in determining privilege or justification] is whether the defendant's conduct is 'sanctioned by the rules of the game which society has adopted.'"  *Phillips*, 959 A.2d at 430 (quoting *Glenn*, 272 A.2d at 899).  While it is a close question, a reasonable jury could find that Chartis's conduct violated these "rules of the game."  Therefore, a genuine dispute of material fact exists on the question of privilege or justification, and so Charbonneau's intentional interference with contractual relations claim (Count V) must move forward to trial.

## IV.    CONCLUSION

Because there is no genuine dispute of material fact and Chartis is entitled to judgment as a matter of law on Charbonneau's breach of contract, breach of the implied duty of good faith, § 8371, and declaratory relief claims, I will enter judgment for Chartis on Counts I, II, IV, and V of the amended complaint.  I will deny the remainder of the motion and allow Charbonneau to proceed to trial on the intentional interference claim (Count III).  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|                                      |   |                 |
|--------------------------------------|---|-----------------|
| JULIE CHARBONNEAU,                   | : |                 |
|                                      | : |                 |
| Plaintiff,                           | : | CIVIL ACTION    |
|                                      | : |                 |
| v.                                   | : |                 |
|                                      | : | NO. 13-4323     |
| CHARTIS PROPERTY CASUALTY CO.,       | : |                 |
|                                      | : |                 |
| Defendant.                           | : |                 |

**ORDER**

   **AND NOW** this 21st day of September, 2015, upon consideration of the evidence

presented at the trial of this matter and the foregoing findings of fact and conclusions of law, **IT

IS HEREBY ORDERED** that judgment is entered in favor of the defendant, Chartis Property

Casualty Company, and against the plaintiff, Julie Charbonneau.

   The clerk shall mark this case **CLOSED FOR STATISTICAL PURPOSES**.

                                                    s/William H. Yohn Jr._____
                                                    William H. Yohn Jr., Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                         |   |                |
|-----------------------------------------|---|----------------|
| JULIE CHARBONNEAU,                      | : |                |
|                                         | : |                |
| Plaintiff,                              | : |                |
|                                         | : | CIVIL ACTION   |
| v.                                      | : |                |
|                                         | : | NO. 13-4323    |
| CHARTIS PROPERTY CASUALTY CO.,          | : |                |
|                                         | : |                |
| Defendant.                              | : |                |

### FINDINGS OF FACT & CONCLUSIONS OF LAW

YOHN, J.                                                           September 21, 2015

On April 4, 2012, plaintiff Julie Charbonneau was residing as a tenant at Bloomfield, a

historic home in Villanova, Pennsylvania, when a fire destroyed the property.  On August 7,

2012 Charbonneau attempted to exercise the option under her lease to purchase Bloomfield from

Jerald Batoff, the property's owner.  On October 1, 2012 Batoff negotiated a settlement of his

homeowner's policy claim with his insurer, defendant Chartis Property Casualty Company.

Chartis ultimately agreed to pay Batoff $18.5 million plus additional payments already made—

an agreement on which Charbonneau was not consulted.  Litigation ensued between Batoff and

Charbonneau, leading to a settlement under which Charbonneau received $11 million of the

$18.5 million and title to Bloomfield.  Charbonneau then brought this action against Chartis for

breach of contract, breach of the implied duty of good faith and fair dealing, intentional

interference with contract, bad faith in violation of 42 Pa. Cons. Stat. Ann. § 8371, and

declaratory relief.  The parties proceeded to trial only on the intentional interference claim.  Now

having considered all of the testimony and exhibits offered during the 7-day bench trial, and

pursuant to Fed. R. Civ. P. 52(a), I make the following findings of fact and conclusions of law.

**I.    FINDINGS OF FACT**

    **A.    The Bloomfield Homeowner's Policy**

1.  From September 9, 2011 through September 9, 2012, the property known as Bloomfield—

    located at 200 South Ithan Avenue in Villanova, Pennsylvania and then owned by Jerald

    Batoff—was covered by a homeowner's insurance policy issued by defendant Chartis

    Property Casualty Company.  (Pl.'s Ex. 3-1; Charbonneau 34-39, Aug. 5, 2015.)

2.  The homeowner's policy provided for two types of coverage in the event of a qualifying loss

    to Bloomfield: "Replacement Cost" coverage and "Guaranteed Rebuilding Cost" coverage.

    (Pl.'s Ex. 3-7.)

3.  Replacement Cost coverage provided that Chartis "will pay the reconstruction cost of

    [Bloomfield], up to the coverage limit shown for that location on your Declarations Page."

    The insured was not required to rebuild the property to obtain the Replacement Cost.  (Pl.'s

    Ex. 3-7.)

4.  The coverage limit for Bloomfield, as listed on the Declarations Page of the homeowner's

    policy, was $22,372,762.  (Pl.'s Ex. 3-1.).

5.  Guaranteed Rebuilding Cost coverage provided that Chartis "will pay the reconstruction cost

    of [Bloomfield] . . . even if this amount is greater than the amount of coverage shown on the

    Declarations Page."  The insured was required to "repair or rebuild . . . at the same location"

    to obtain the property's Guaranteed Rebuilding Cost.  (Pl.'s Ex. 3-7.)

6.  The homeowner's policy further provided that, following a covered loss, the insured was

    required to "[s]end to [Chartis] within sixty (60) days of [its] request, your signed sworn

    proof of loss," which sets out, among other information, "[t]he dollar amount being claimed

    as your loss."  (Pl.'s Ex. 3-17.)

**B.**    **The Lease-Option Agreement**

7.  Plaintiff Julie Charbonneau and Batoff entered into a lease-option agreement ("LOA") for

Bloomfield, effective November 3, 2011, with Charbonneau as tenant and Batoff as landlord.

(Pl.'s Ex. 2.)

8.  The LOA provided that Charbonneau had the option to purchase Bloomfield at any time

during the term of the LOA.  (Pl.'s Ex. 2-2.)

9.  The LOA provided that upon receiving notice of Charbonneau's exercising the option, Batoff

must set a closing date within 60 days.  In the event that Batoff terminated the agreement,

Charbonneau could still exercise her option within 45 days so long as she cured all monetary

defaults.  (Pl.'s Ex. 2-2.)

10. The LOA provided that if Bloomfield were to suffer a casualty causing more than $1 million

in damage during the term of the LOA, Charbonneau could exercise her option and "shall be

entitled to receive at closing a credit in the amount of any insurance proceeds paid to

[Batoff], and an assignment of [his] rights to receive any unpaid proceeds."  (Pl.'s Ex. 2-7.)

11. The same provision of the LOA stated that, in the event of such a casualty, Batoff "may

make proof of loss; provided, however, that any adjustment of a proof of loss shall require

the prior written consent of [Charbonneau], which shall not be unreasonably withheld or

delayed."  (Pl.'s Ex. 2-7.)

12. Dean Topolinski, Charbonneau's co-tenant and significant other, joined the LOA as a

guarantor.  (Pl.'s Ex. 2-21.)

13. Charbonneau held insurance policies with Chartis, covering her personal property and her

artwork at Bloomfield.  Topolinski also held a policy with Chartis for his personal property at

Bloomfield.  (Pl.'s Ex. 4, 5, 6.)

### C.    The Fire at Bloomfield

14. On April 4, 2012, Bloomfield was severely damaged by fire.  (Charbonneau 60-64, Aug. 5, 2015.)

15. On April 5, 2012, Charbonneau and Topolinski agreed that the public adjusting firm Clarke & Cohen would handle their respective contents and her arts insurance claims. (Charbonneau 69-73, Aug. 5, 2015; Topolinski 236-38, Aug. 5, 2015.)

16. On April 5, 2012, Charbonneau told Herb Bailey of Chartis about their retaining Clarke & Cohen.  (Charbonneau 71, Aug. 5, 2015; Topolinski 237-38, Aug. 5, 2015.)

17. On April 6, 2012, Batoff retained Clarke & Cohen to represent him regarding his claim for Bloomfield under the homeowner's policy.  (Pl.'s Ex. 13.)

18. Richard Cohen, president of Clarke & Cohen, had known Batoff socially for at least 25 years before the fire at Bloomfield.  (Cohen Dep. 38:14-17; 56:5-18, Nov. 13, 2014.)

19. Cohen became aware of the LOA as of, at the latest, April 10, 2012.  (Cohen Dep. 140:3-8.)

20. On or around April 6, 2012, Chartis assigned James O'Keefe to handle all four claims arising out of the Bloomfield fire: Batoff's homeowner's claim, Charbonneau's contents claim, Charbonneau's arts claim, and Topolinski's contents claim.  (O'Keefe 5-6, Aug. 7, 2015.)

21. On April 13, 2012, O'Keefe emailed Cohen to ask for copies of various relevant documents, including the LOA.  (Pl.'s Ex. 25; O'Keefe 97-98, Aug. 7, 2015.)

22. O'Keefe received from Cohen, among other records, a copy of the LOA and information about deposits made toward the purchase of Bloomfield.  (Pl.'s Ex. 31, 39.)

23. In his April 27, 2012 claim notes, O'Keefe recorded his understanding of Charbonneau's rights under the LOA.  (Pl.'s Ex. 40-3; O'Keefe 14-16, Aug. 7, 2015.)

24. During April 2012, Chartis retained Wakelee Associates, LLC, to document fire damage, oversee salvage work, and estimate the cost of repairing Bloomfield. (O'Keefe 77-78, Aug. 7, 2015; Segedin 11-13, 16-17, Aug. 12, 2015.)

   **D.    The July 6, 2012 Meeting[1]**

25. O'Keefe met with Cohen and Damon Faunce, also of Clarke & Cohen, at Clarke & Cohen's offices on July 6, 2012. The purpose of this meeting was to discuss possible settlement of the homeowner's claim. (Def.'s Ex. 97; O'Keefe 24-25, 117-19, Aug. 7, 2015.)

26. At the July 6 meeting, Cohen suggested that Bloomfield was a total loss and would require approximately $35 million to repair. O'Keefe asserted that it would cost less than the policy limit of $22,372,762 to repair. (Def.'s Ex. 97-2; O'Keefe 126-29, Aug. 7, 2015.)

27. Cohen's figure of approximately $35 million was based on information from CDF Construction, Inc., which Clarke & Cohen had retained to estimate the cost of repairing Bloomfield. (Pl.'s Ex. 128; Cohen Dep. 252:7-253:5.)

28. Cohen has stated that his use of the $35 million figure could be characterized as "posturing" with Chartis. (Cohen Dep. 385:1-386:4.) Batoff testified that he told Cohen he did not think

---

[1] Faunce testified that Cohen told him the Lease-Option Agreement had to be broken so that Batoff got all of the insurance money. He stated that Cohen said the way to break the Lease-Option Agreement was to accuse Charbonneau and Topolinski of arson. Faunce also testified that O'Keefe later said to him that Batoff "must be bummed out about the deal" and that Batoff should "give her $1,000,000 and kick her to the curb." O'Keefe testified that he never said anything about kicking Charbonneau to the curb for $1,000,000 or accusing Charbonneau and Topolinski of arson in order to breach the LOA.

The court finds that Faunce's testimony regarding the July 6 meeting is not credible. First, his account is uncorroborated, whereas the accounts of O'Keefe and Cohen largely align with one another. Second, O'Keefe's contrary testimony is supported by his notes in Chartis's internal system, in which O'Keefe contemporaneously recorded his interactions and observations. Third, Faunce's testimony at trial materially differed from the statements he made in his affidavit on April 4, 2013, and at his deposition on October 14, 2014. (Faunce 225-27, 258-59, Aug. 6, 2015.) Fourth, Cohen testified that at the end of October 2012 Faunce was "having a very hard time . . . he was basically scared . . . he was very emotional . . . it seemed like he was scared for his life . . . for his family . . . he was concerned that people were watching him." Batoff confirmed that at the meeting in his apartment with Cohen and Faunce in October or November of 2012, Faunce was extremely upset because he felt that Topolinski had planted drugs in his car and he started crying hysterically. Subsequently, Faunce was institutionalized for treatment of alcohol abuse.

they had enough information for Cohen to tell Chartis that the claim was worth $34-35,000,000, but Cohen told him that this "is the way it is done."

29. O'Keefe disagreed with Cohen's figure, based on O'Keefe's view that Bloomfield was not a total loss and on Chartis's internal, pre-fire estimates of the cost to replace Bloomfield. (Def.'s Ex. 97-2; O'Keefe 128-29, Aug. 7, 2015.)

30. At the same July 6 meeting, the contents and arts claims of Charbonneau and Topolinski were also discussed. (Def.'s Ex. 97-3; O'Keefe 135-37, Aug. 7, 2015.)

31. Also at the July 6 meeting, Cohen told O'Keefe that Batoff's attorneys were addressing Charbonneau's option under the LOA. (Def.'s Ex. 97-2; O'Keefe 131-32, Aug. 7, 2015.)

### E.    The Batoff-Charbonneau Dispute

32. On July 25, 2012, Batoff delivered a letter to Charbonneau, stating that the purchase option provision of the LOA was void. (Pl.'s Ex. 65; Charbonneau 79-82, Aug. 5, 2015.)

33. Batoff wrote that Charbonneau breached the LOA on nine different grounds. (Pl.'s Ex. 65.)

34. Batoff wrote that "the cause of the fire is still under investigation. If the cause is something for which you bear legal responsibility, that would serve as an additional basis requiring you to replace the property." (Pl.'s Ex. 65-2.)

35. Batoff also stated that he had no obligation to rebuild Bloomfield. (Pl.'s Ex. 65-2.)

36. After reading the July 25 letter, Charbonneau "knew that [Batoff] was no longer going to present a claim to Chartis for building loss on [her] behalf under the [LOA]." (Charbonneau 131-32, Aug. 5, 2015.)

37. Even after receiving this letter, Charbonneau did not revoke whatever authority she felt Clarke & Cohen had to represent her in negotiations with Chartis on the Bloomfield claim. (Charbonneau 132, Aug. 5, 2015.)

38. Charbonneau contends that Chartis was obligated to involve her in the Bloomfield claim by obtaining her consent before resolving it.  However, she never interjected herself in the claim by notifying Chartis that she contended she had a right to consent to any settlement.  The LOA, in fact, conditions her right to consent on an adjustment of the proof of loss.  The parties agree that a proof of loss was never submitted to Chartis

39. Also on July 25, 2012, Batoff filed a writ of summons against Charbonneau in the Delaware County Court of Common Pleas.  On August 15, 2012, Batoff filed a complaint seeking declaratory relief against Charbonneau, and the case was later removed to this court.  (Pl.'s Ex. 179; *Batoff v. Charbonneau* (*Batoff I*), No. 12-cv-5397-WY (E.D. Pa. Sept. 21, 2012).)

40. Among other relief sought in *Batoff I*, Batoff asked the court to declare that Charbonneau had no valid option to purchase Bloomfield, no claim to proceeds under the homeowner's policy, and no right to participate in or consent to any adjustment of any insurance claim arising under the homeowner's policy.  (Pl.'s Ex. 179 at 26.)

41. That same day, on July 25, 2012, Batoff emailed Cohen, stating:

> I understand that Julie Charbonneau and Dean Topolinski may ask to have access to the storage area in which elements of the finishes from Bloomfield are currently stored. Those finishes are germane only to my insurance claim regarding destruction of the real property.  Accordingly, there is no reason for them to have access to the storage area and they are not permitted to have access.

(Pl.'s Ex. 66.)

42. On July 26, 2012, Batoff emailed Cohen again, stating:

> With regard to my insurance claim with Chartis for the destruction of Bloomfield, I am directing that you refrain from any discussion with Julie Charbonneau or Dean Topolinski.  They were not insured under my policy, and they have no legal interest in my claim.  If they have any inquiries with regard to my claim, you should simply tell them that any inquiries should be directed to me.

(Pl.'s Ex. 67.)

43. Charbonneau's counsel sent a letter to Batoff on August 7, 2012, attempting to exercise her option to purchase Bloomfield and proposing a closing date of September 7, 2012.  (Pl.'s Ex. 69.)

44. On August 15, 2012, Batoff's counsel sent a letter to Charbonneau's counsel, stating that Charbonneau "has no legal right to participate in, approve, or share in the adjustment or proceeds of [the homeowner's policy]."  (Pl.'s Ex. 71.)

45. Although Batoff received the August 7, 2012 letter from Charbonneau's counsel attempting to exercise the option, Batoff never received any title documents or settlement sheets or proposed deed or any other information at all concerning the proposed settlement on September 7, 2012.

46. On August 30, 2012, counsel for Charbonneau asked Batoff's attorney if Batoff would be willing to enter into a "'standstill agreement' with regard to developments at [Bloomfield] and the insurance claim."  (Pl.'s Ex. 80.)

47. On September 24, 2012, Batoff's attorney informed Charbonneau's attorney that Batoff "sees no reason to enter into any agreement restricting his freedom of action with regard to his property or with regard to his claim under his insurance policy.  Accordingly, Mr. Batoff will not enter into any standstill agreement."  (Pl.'s Ex. 85.)

    F.     **The Batoff-Chartis Negotiations**

48. Wakelee produced an estimate for Chartis, dated August 17, 2012, stating that the projected cost to repair Bloomfield would be $16,042,126.50.  (Def.'s Ex. 43.)

49. O'Keefe found this figure slightly low, because the estimate provided for 5% overhead, not the 10% figure generally used by Chartis, and it did not include the costs of landscaping or upgrades to Bloomfield to comply with building codes.  (O'Keefe 146-48, Aug. 7, 2015.)

50. On August 24, 2012, in an email to colleagues at Chartis, O'Keefe stated that the cost to

repair Bloomfield would be at least $16 million.  O'Keefe also noted that Clarke & Cohen

had not yet submitted a formal claim as to the Bloomfield homeowner's policy.  (Pl.'s Ex.

75; O'Keefe 150-53, Aug. 7, 2015.)

51. On September 4, 2012, O'Keefe and Cohen met to discuss possible settlement of the

Bloomfield homeowner's policy claim.  (Def.'s Ex. 118; O'Keefe 153-55, Aug. 7, 2015.)

52. At the September 4 meeting, Cohen stated that Clarke & Cohen would submit a final claim

within the month.  (Def.'s Ex. 118; O'Keefe 154-55, Aug. 7, 2015.)

53. On September 16, 2012, Cohen sent an email to O'Keefe, stating:

> I think it is important to remind you that we are quickly coming to the end of the
> window Mr. Batoff has allowed me to continue discussing a negotiated deal.  If
> we are not able to come to an agreed figure by the end of this week, I am being
> directed to proceed with submitting our claim.
>
> As I also told you when we spoke on Monday of last week, I had no room to
> negotiate from the figure I expressed would get this done.  Frankly, I am a little
> surprised by your most recent offer based on the potential exposure to Chartis if
> we do not get a deal done.  The figure I gave you is a significant savings to
> Chartis and I think we both agree we will get to the total policy limits as well as
> far into the guaranteed replacement cost provision the longer this continues.
> During that time, Mr. Batoff will be in possession of a significant amount of
> undisputed proceeds to finance our ongoing negotiations.
>
> Although we do not have an agreed figure at this point, I am attaching a letter
> from counsel which responds to your request for a legal position with regards to
> any potential insurable interest of any party other than Mr. Batoff.

(Pl.'s Ex. 79; O'Keefe 158-63, Aug. 7, 2015.)

54. Cohen's September 16 email to O'Keefe enclosed a letter from Batoff's attorney stating that

"Charbonneau is a stranger to the [homeowner's p]olicy purchased by and for the sole benefit

of Mr. Batoff.  Strangers to policies of insurance have no right to receive or control in any

manner the proceeds of policies belonging to others."  (Pl.'s Ex. 78.)

9

G.    **The Chartis-Batoff Settlement Agreement**

55. In late September 2012, Chartis negotiated with Batoff's counsel to resolve the homeowner's

claim through a settlement and release agreement.  (O'Keefe 167-69, Aug. 7, 2015.)

56. It was not an unusual practice for Chartis to resolve large property claims through settlement

and release agreements, rather than proofs of loss, because when a claim is resolved by proof

of loss, the insured may seek additional payments in the future by submitting an amended

proof of loss.  (Piotrowski 213, 215-17 Aug. 7, 2015; O'Keefe 174-75, Aug. 7, 2015.)

57. At Batoff's request, the settlement agreement required Chartis to pay $18.5 million to Batoff

by wire transfer.  (Pl.'s Ex. 92-2; O'Keefe 173-74, Aug. 7, 2015.)

58. At Batoff's request, the settlement agreement included a waiver of Chartis's subrogation

rights and an assignment of those rights to Batoff, which potentially could give him a claim

against Charbonneau and Topolinski for arson.  (Pl.'s Ex. 92-3; Batoff Dep. 158:5-159:13,

May 13, 2015.)

59. Batoff signed the final settlement agreement on October 1, 2012.  Peter Piotrowski, Senior

Vice President of Claims, signed the agreement for Chartis.  (Pl.'s Ex. 92.)

60. From all of the evidence, I find that Batoff was the moving force in settling the claim for a

release and cash payment and that he was neither induced nor otherwise caused by Chartis to

breach the LOA, if, indeed, there was a breach of the LOA.

61. In mid-October 2012, Charbonneau learned that the Bloomfield homeowner's claim had been

settled.  (Charbonneau 90-91, Aug. 5, 2015.)

62. On October 22, 2012, the court granted Charbonneau's motion for a temporary restraining

order, freezing $17.4 million of the remaining insurance proceeds paid to Batoff by Chartis.

(*Batoff I* at Doc. No. 17.)

63. On November 15, 2012, Charbonneau's counsel put Clarke & Cohen on notice of possible

claims that Charbonneau may have had against the firm for allegedly working with Batoff in

secret to settle the homeowner's claim.  (Pl.'s Ex.105; Charbonneau 197-99, Aug. 5, 2015.)

64. Charbonneau and Batoff entered into a settlement agreement and mutual release, effective

April 5, 2013.  (Pl.'s Ex. 115.)

65. Through the April 5 settlement agreement, Charbonneau received $11 million from the

frozen funds, Batoff retained the balance, and Batoff agreed to convey title to Bloomfield to

Charbonneau.  (Pl.'s Ex. 115; Charbonneau 89-92, Aug. 5, 2015.)

66. Charbonneau received title to Bloomfield in May 2013.  (Charbonneau 205, Aug. 5, 2015.)

## II.    CONCLUSIONS OF LAW

67.    Under Pennsylvania law, a plaintiff claiming intentional interference with contract

must prove four elements: "(1) the existence of a contractual . . . relation between the

complainant and a third party; (2) purposeful action on the part of the defendant, specifically

intended to harm the existing relation . . . ; (3) the absence of privilege or justification on the part

of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's

conduct."  *Ira G. Steffy & Son, Inc. v. Citizens Bank of Penn.*, 7 A.3d 278, 288-89 (Pa. Super. Ct.

2010).  These elements do not explicitly require that the third party breached the contract, but

such a showing is still necessary to prevail on the claim, because "[t]he Pennsylvania Supreme

Court has explicitly adopted the standard of the Restatement (Second) of Torts § 766 (1979) for

determining the elements for tortious interference with existing contractual relationships."

*Nathanson v. Med. Coll. of Penn.*, 926 F.2d 1368, 1388 (3d Cir. 1991).  Section 766, in turn,

does specify that the defendant must cause the third party to breach the contract in question:

> One who intentionally and improperly interferes with the performance of a
> contract (except a contract to marry) between another and a third person by

> inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.  The Third Circuit has likewise explained that "Section 766 addresses disruptions caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach its contract with the plaintiff." *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir. 1993).

### A.    Existence of a Contract

68.    The parties do not dispute the existence of a contract—the LOA—between Charbonneau and Batoff.  The first element of intentional interference is therefore satisfied.

### B.    Purposeful Action by Chartis Specifically Intended to Harm the Contractual Relationship between Charbonneau and Batoff

69.    A defendant is liable for intentional interference with contract only if he "induc[es] or otherwise caus[es] the third party [Batoff] not to perform the contract." Restatement (Second) of Torts § 766.  Comment H to § 766 sheds light on that requirement:

> The word "inducing" refers to the situations in which A causes B to choose one course of conduct rather than another.   Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences.   Inducement operates on the mind of the person induced.   The phrase "otherwise causing" refers to the situations in which A leaves B no choice, as, for example, when A imprisons or commits such a battery upon B that he cannot perform his contract with C, or when A destroys the goods that B is about to deliver to C. . . . The rule stated in this Section applies to any intentional causation whether by inducement or otherwise.   The essential thing is the intent to cause the result.   If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

§ 766 cmt. h.  The "otherwise causing" language is not at issue here, so the relevant inquiry is whether Charbonneau has proven that Chartis "induced" Batoff not to perform under the LOA.

70.     Inducement is "[t]he act or process of enticing or persuading another person to take a certain course of action."  Inducement, *Black's Law Dictionary* (10th ed. 2014). Pennsylvania Suggested Standard Jury Instructions state that "inducing" refers to a situation where a defendant forces [a third party] to choose one course of conduct rather than another.  Pa. S.S.J.I. (Civ.) § 17.280.

71.     Assuming that a breach of the LOA occurred in the first place, Chartis argues that it could not have "induced" Batoff to breach because Batoff himself independently desired to prevent Charbonneau from having any input in his settlement of the homeowner's policy claim and from receiving any funds ultimately paid out under that claim.  *See* Def.'s Proposed Findings of Fact & Conclusions of Law ("Def.'s PFFCL") at 49-50.  Charbonneau disagrees, stating that "[u]nder Pennsylvania law, the defendant can possess the requisite intent or knowledge for tortious interference with contract even if the breaching party independently wanted to breach the contract."  Pl.'s Proposed Findings of Fact & Conclusions of Law (Pl.'s PFFCL) at 29.  Charbonneau cites only two cases in support of this point: *Odyssey Waste Services, LLC v. BFI Waste Systems of North America, Inc.*, No. CIV.A. 05-CV-1929, 2005 WL 3110826 (E.D. Pa. Nov. 18, 2005), and *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Company*, 592 F. Supp. 127 (E.D. Pa. 1984).  Charbonneau characterizes *Odyssey Waste* as "uph[olding]" a claim of intentional interference "even though [the] breaching party conspired with [defendants] to develop a strategy to allow [the breaching party] to get out of its contract with [plaintiff]."  Pl.'s PFFCL at 29 (internal quotation marks omitted).  It is true that, in the decision cited by plaintiff, the court allowed an intentional interference claim to survive a motion to dismiss.  *Odyssey Waste*, 2005 WL 3110826 at *5-7.  But on a subsequent motion under Rule

56, the court entered judgment for defendant on that intentional interference claim precisely because of the breaching party's clear intent to breach. As the court explained:

> A contrary holding here risks saddling third parties with the responsibility of policing the current contracts of their prospective business partners and exercising a kind of *in loco parentis* conscience for those potential partners for the protection of the very party sought to be replaced. Not only would such a duty be unrealistic, the Court gravely doubts it could ever be workable, much less successful.

*Odyssey Waste Servs., LLC v. BFI Waste Sys. of N. Am., Inc.*, No. 05-CV-1929, 2007 WL 674594, at *12 (E.D. Pa. Feb. 28, 2007). In other words, the court in *Odyssey Waste* ultimately concluded that the third party's independent desire to breach its contract with plaintiff did undermine plaintiff's intentional interference claim. *Odyssey Waste*, therefore, provides persuasive support for Chartis's argument that it cannot be found to have induced breach because Batoff wanted to breach already. Likewise, plaintiff cites *Reliable Tire* for the proposition that intentional interference can be found "even though [the] breaching party affirmatively contacted defendant to discuss conduct that would result in breach of contract, rather than vice versa." Pl.'s PFFCL at 29. But one Pennsylvania state court criticized *Reliable Tire* as "present[ing] an incomplete picture" of § 766 in terms of what plaintiff's intent must be to give rise to liability for intentional interference. *See Amico v. Radius Commc'ns*, No. 1793, 2001 WL 1807391, at *5 n.8 (Pa. Com. Pl. Oct. 29, 2001).[2] *Reliable Tire* is, moreover, not binding here, and for the reasons stated in *Amico*, I further decline to follow its reasoning on this point.

---

[2] Specifically, *Reliable Tire* stated that plaintiff "need not show express evidence of [defendant's] intent [to interfere]; it is enough that the interference is certain or substantially certain to occur as a result of the action." *Reliable Tire*, 592 F. Supp. at 139 (citing Restatement (Second) of Torts § 766 cmt. j (1979)). But as noted in *Amico*, Comment J offers an important caveat not reflected in *Reliable Tire*, namely:

> If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

72.    In sum, Charbonneau provides no persuasive authority—let alone binding precedent—for the proposition that a defendant can be found to have "induced" breach even where the third party independently intended to breach the contract all along.  Yet it is clear that Charbonneau has premised her case on such a theory of liability.  Indeed, at the close of trial, plaintiff's counsel acknowledged that Batoff intended to keep Charbonneau from participating in the adjustment of the homeowner's claim and from receiving any funds under that claim:

> MR. MCMULLEN: No proof of loss was ever filed. . . . [A]nd there's testimony from Mr. Cohen to this effect, Mr. Cohen who was clearly adverse to Ms. Charbonneau, that Mr. Batoff did not want to file a proof of loss. Mr. Batoff admits that himself, because he did not want Ms. Charbonneau to have to participate in --

> THE COURT: Well, yeah, it's his idea.

> MR. MCMULLEN: It was his idea, but Chartis allowed that to happen . . . .

> *          *          *

> MR. MCMULLEN: The plaintiff's case here is not predicated on the RICO claim. It is predicated on Chartis's actions that induced Mr. Batoff to settle that claim, one component of which was giving him the subrogation rights so that he could go after Ms. Charbonneau in an effort to nullify the lease, the same effort to nullify the lease he had thought about from day one right after the fire, they gave him the ability to do it, but there's more than that, it's about the settlement.

> THE COURT: But that's his request, not their request.

> MR. MCMULLEN: But they enabled him to do that. They gave him the means to sue her and accuse her of arson.

> THE COURT: Well is enabling the same as inducing?

> MR. MCMULLEN: It is. In this context it is.

---

*Amico*, 2001 WL 1807391, at *5 n.8 (quoting Restatement (Second) of Torts § 766 cmt. j).  Thus, defendant's intent to interfere, or lack thereof, is indeed relevant to the court's analysis of whether defendant's actions were privileged or justified—that is, the third element of an intentional interference with contract claim.

Trial Tr. 15, 37-38, Aug. 13, 2015.  Charbonneau's core argument here—that Chartis can and should be found liable for intentionally enabling Batoff's breach—is supported neither by Pennsylvania case law nor by the ordinary and accepted definition of inducement.[3]  Even assuming that Batoff breached the LOA in the first place, therefore, Charbonneau has not proven by a preponderance of the evidence that Chartis induced Batoff to engage in such a breach.  To the contrary, the evidence proves that Batoff did not intend to comply with, and in fact, disavowed, his obligations under the LOA long before Chartis settled the Bloomfield claim and regardless of anything Chartis did along the way.  Indeed, I have found as a fact that based on all of the evidence it was Batoff who was the moving force in settling the claim for a cash payment.

73.    Moreover, Charbonneau has failed to prove that Batoff even breached the LOA by settling his homeowner's claim with Chartis.  Again, the relevant text of the contract provides:

> If the cost to repair any damage is more than $1,000,000, [Charbonneau] may elect to exercise [her] Option, and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to [Batoff], and an assignment [of] all of [Batoff]'s rights to receive any unpaid proceeds.  [Batoff] may make proof of loss; provided, however, that any adjustment of a proof of loss shall require the prior written consent of [Charbonneau], which shall not be unreasonably withheld or delayed.

Pl.'s Ex. 2-7.[4]  Charbonneau broadly characterizes this clause as providing her with a "Right to Consent."  Pl.'s PFFCL ¶¶ 11-13.  However, Charbonneau only had the right to consent to adjustment of a proof of loss, and plaintiff admits that Batoff resolved his homeowner's claim without filing any proof of loss.  *See* Pl.'s PFFCL ¶ 91.  Plaintiff offers three reasons why Batoff

---

[3] Charbonneau argues at length about the level of intent required to prove her claim, primarily asserting that Chartis can be found liable if it "desire[d] to cause consequences of [its] act, or . . . believe[d] that the consequences [we]re substantially certain to result from it."  Pl.'s PFFCL at 23 (quoting Restatement (Second) of Torts § 8A).  Even assuming (1) that plaintiff is correct on this point, and (2) that settling the homeowner's claim without proof of loss breached the LOA, Charbonneau has at most proven Chartis's intent to enable breach, not its intent to induce breach.

[4] Charbonneau never requested or received an assignment of Batoff's rights to receive any unpaid insurance proceeds.

16

still breached the LOA in spite of this apparent compliance with its terms. First, Charbonneau

argues that "Batoff subsequently agreed to give the majority of the Chartis-Batoff Settlement

amount, as well as title to Bloomfield, to [her]—clear indication that he had breached the LOA."

Pl.'s PFFCL at 23. This argument ignores the settlement agreement's "denial of liability" clause,

however, which states that "the giving of said consideration" shall not be "construed as an

admission by any party to this Agreement . . . of the validity of the claims of any other party to

this Agreement." Pl.'s Ex. 115 at ¶ 8.[5] Second, Charbonneau states that "Chartis has never

contended that Batoff *did not* breach the LOA." Pl.'s PFFCL at 23 (emphasis added). Yet it is

hornbook law that Charbonneau, as plaintiff, not Chartis, as defendant, bears the burden of proof

on this point. Finally, Charbonneau asserts that Batoff's "refusal to schedule a closing after [she]

exercised her option[] constituted an anticipatory breach." *Id.* at 22. Even if I do not deem this

argument waived for having been raised so belatedly, for all the same reasons stated above

regarding the original theory of breach, plaintiff has also failed to prove that Chartis "induced"

Batoff to commit an anticipatory breach.[6]

74.    In sum, Charbonneau was required to prove at trial both that Batoff breached the

LOA and that Chartis induced Batoff to breach. Charbonneau proved neither. Therefore,

plaintiff has not met her burden, and judgment must be entered for defendant.

### C.    Absence of Privilege or Justification on the Part of Chartis

75.    Pennsylvania courts look to Restatement (Second) of Torts § 767 "[i]n

determining whether a particular course of conduct is improper for purposes of setting forth a

---

[5] Prior to entering the settlement agreement, Charbonneau had claimed that Batoff breached the LOA. *See* Verified & Amended Answer, Affirmative Defenses, & Counterclaims of Defs. Julie Charbonneau & Dean Topolinski (Doc. No. 14), *Batoff I*, No. 12-cv-5397-WY (E.D. Pa. Oct. 22, 2012), at ¶¶ 132-33.

[6] Plaintiff's proposed findings of fact and conclusions of law appear to be the first filing in which Charbonneau argues that Chartis induced Batoff to breach the LOA prior to his settling of the Bloomfield homeowner's claim without her consent.

cause of action for intentional interference with contractual relationships." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997). "This section provides the following factors for consideration: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference, and 6) the relationship between the parties." *Id.* "Although this evaluation of interests is not always susceptible of 'precise definition,' it is clear that the central inquiry [in determining privilege or justification] is whether the defendant's conduct is 'sanctioned by the rules of the game which society has adopted.'" *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971)).

76.    As Chartis correctly notes, under Pennsylvania's Unfair Insurance Practices Act ("UIPA"), an insurer is prohibited from engaging in "an unfair method of competition" or "an unfair or deceptive act or practice." 40 Pa. Stat. § 1171.4. Those terms are set out in the UIPA to encompass "unfair claim settlement or compromise practices," which specifically include "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear." *Id.* § 1171.5. The facts adduced at trial show that Chartis (acting through O'Keefe) retained Wakelee to estimate the cost of repairing Bloomfield, and that on August 17, 2012, Wakelee provided O'Keefe with a cost estimate for repairing Bloomfield amounting to $16,042,126.50. *See* Facts 46. O'Keefe also credibly testified that he found this estimate slightly low in certain areas. *Id.* 47. Chartis therefore could have concluded that its liability under the Bloomfield homeowner's policy had become reasonably clear, totaling to slightly above Wakelee's estimated figure. Thus, at the point thereafter when Batoff was willing to resolve his homeowner's claim for $18.5 million, it

may well have amounted to an unfair claim settlement practice for Chartis to have refused to settle.  Indeed, as Chartis further notes, such a refusal could have bolstered a claim of bad faith against the insurer under 42 Pa. Cons. Stat. Ann. § 8371.  *See Parasco v. Pac. Indem. Co.*, 920 F. Supp. 647, 655 & n.5 (E.D. Pa. 1996) (noting that "a violation of the UIPA does not constitute bad faith *per se*; rather, the UIPA serves as a reference from which a court may determine whether an insurer has acted in bad faith in a given case").  It cannot be the case that Chartis violated "the rules of the game" when it avoided acting in bad faith toward Batoff, its homeowner's policyholder, as it did in settling his claim.

77.    Charbonneau responds that none of these obligations "prevent[ed] Chartis from asking Clarke & Cohen or Batoff to secure from [her] a written representation that she consented to the settlement in keeping with her Right to Consent under the LOA."  Pl.'s PFFCL at 33.  However, the Pennsylvania Supreme Court has stated that, in an analogous situation where an insured property is destroyed by fire after a contract for sale has been signed but before closing has occurred, the insurer has "no equitable right to intermeddle between the [seller] and the [buyer].  Under such circumstances they must be content to respond to the party with whom they made the contract of insurance."  *State Mut. Fire Ins. Co. v. Updegraff*, 9 Harris 513, 521 (Pa. 1853).  Moreover, Batoff's attorney wrote in a September 14, 2012 letter to O'Keefe that "Charbonneau is a stranger to the [homeowner's p]olicy purchased by and for the sole benefit of Mr. Batoff.  Strangers to policies of insurance have no right to receive or control in any manner the proceeds of policies belonging to others."  Facts 52.  Having received that message from Batoff—the named insured under the homeowner's policy—and being in a situation where it likely had no "right to intermeddle" between Batoff and Charbonneau, Chartis again did not

violate the "rules of the game" by negotiating solely with Batoff to settle the Bloomfield homeowner's claim.

78.     Charbonneau further finds fault with Chartis's allowing Batoff not to file a proof of loss, paying Batoff via wire transfer, and waiving its subrogation rights. Pl.'s PFFCL at 32-33. But the credible evidence adduced at trial showed that it was a matter of common practice for Chartis to settle similarly large claims by way of release, rather than by proof of loss, and that this practice was reasonably based on Chartis's desire for finality in such a resolution. Facts 54. The credible evidence also showed that Batoff, not Chartis, requested both that payment be made by wire transfer and that Chartis waive its subrogation rights. *Id.* 55-56. Consequently, Charbonneau did not prove that Chartis violated the "rules of the game" with any of these acts.

79.     Even if Charbonneau had proven at trial that Batoff breached the LOA and that Chartis induced the breach, therefore, Charbonneau failed to show that Chartis acted without justification in doing so—that is, that Chartis violated by "the rules of the game which society has adopted." *Phillips*, 959 A.2d at 430 (internal quotation marks omitted). This constitutes another independently sufficient basis to enter judgment for defendant.

### D.    Actual Legal Damage as a Result of Defendant's Conduct

80.     Because plaintiff has failed to prove the second and third elements of her intentional interference claim, I need not address the fourth element of damage. I note, however, that in *Odyssey Waste*—specifically, in the summary judgment opinion not cited by plaintiff— the court concluded that, where defendant did not induce breach but merely may have enabled breach, "[defendant]'s conduct lacks proximity to [plaintiff]'s alleged loss," and that "[w]hile [plaintiff] may have suffered damages due to [third party's breach], there is nothing in the record demonstrating that [plaintiff]'s alleged losses occurred as a result of [defendant]'s actions."

**A55**

*Odyssey Waste Servs.*, 2007 WL 674594, at *12-13.  By the same token, even if Batoff breached the LOA and Charbonneau suffered damages, Chartis's conduct lacks proximity to this loss, and no evidence adduced at trial proved that Charbonneau's loss came as a result of Chartis's actions.

**III.    CONCLUSION**

For the reasons set forth above, I will enter judgment for defendant Chartis Property Casualty Company on the claim of intentional interference with contract.  An appropriate order follows.